IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| RONALD BARRANCO, | ) | CIVIL NO. 13-00412 LEK-RLP |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| 3D SYSTEMS CORPORATION, a | ) | |
| Delaware corporation, 3D | ) | |
| SYSTEMS, INC., a California | ) | |
| corporation, ABRAHAM | ) | |
| REICHENTAL, DAMON GREGOIRE, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**ORDER DENYING DEFENDANTS' MOTION TO DISMISS PURSUANT
TO FED. R. CIV. P. 12(b)(2) OR, IN THE ALTERNATIVE,
TO TRANSFER PURSUANT TO 28 U.S.C. § 1404**

On October 21, 2013, Defendants 3D Systems Corporation ("3D Corp."), 3D Systems, Inc. ("3D Inc.," collectively, "3D Systems"), Abraham Reichental ("Reichental"), and Damon Gregoire ("Gregoire," collectively "Defendants") filed their Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(2) or, in the Alternative, to Transfer Pursuant to 28 U.S.C. § 1404 ("Motion"). [Dkt. no. 6.] Plaintiff Ronald Barranco ("Plaintiff") filed his memorandum in opposition on January 6, 2014, and Defendants filed their reply on January 14, 2014. [Dkt. nos. 27, 30.]

On January 31, 2014, this Court issued an entering order vacating the hearing on the Motion. [Dkt. no. 34.] After careful consideration of the Motion, supporting and opposing memoranda, and the relevant legal authority, Defendants' Motion is HEREBY DENIED, for the reasons set forth below.

## BACKGROUND

The Complaint asserts that, for the past thirty years, Plaintiff has worked in the field of 3D printing, which is the "additive manufacturing process of making a three-dimensional solid object of virtually any shape from a digital model." [Complaint at ¶ 16.]  Over the past fifteen years, Plaintiff also developed and owned several businesses in the 3D printing industry.  [Id. at ¶ 17.]

The Complaint alleges that, over the past twenty years, Plaintiff created and owned more than 100 domain names associated with different technologies and businesses in the 3D printing industry.  [Id. at ¶ 18.]  Examples of domain names that Plaintiff created include: (1) www.stereolithography.com ("Stereolithography.com"); and (2) www.lasersintering.com ("Lasersintering.com").  Plaintiff created Stereolithography.com and Lasersintering.com on October 31, 1997 and February 13, 2004, respectively.  [Id. at ¶¶ 19, 23.]  Stereolithography.com and Lasersintering.com were to license their respective domain names, websites, and instant online quote engines to "third parties who broker physical, three-dimensional printed objects." [Id. at ¶¶ 22, 26.]

According to the Complaint, 3D Corp. is incorporated in Delaware and operates through its subsidiaries in the United States, Europe, and the Asia-Pacific region.  3D Corp. provides

2

3D content-to-print solutions, and produces 3D printers, integrated print materials, and on-demand custom parts services. Plaintiff alleges that 3D Inc. is a subsidiary of 3D Corp. Plaintiff also alleges that 3D Inc. is the alter ego and/or agent of 3D Corp., and that 3D Corp. is actively involved in the day-to-day operations of 3D Inc.  Plaintiff asserts that both 3D Corp. and 3D Inc. have: corporate offices located at the same address in Rock Hill, South Carolina; and common officers and directors, including Reichental and Gregoire.  3D Corp. is involved in the acquisitions of 3D Inc., and also transacts business by or on behalf of 3D Inc.  [Id. at ¶¶ 27-34.]

The Complaint alleges that, on July 10, 2001, 3D Systems contacted Plaintiff in Hawai`i to see if he would be interested in selling Stereolithography.com and its related business, but Plaintiff declined.  3D Systems contacted Plaintiff again on June 6, 2009, this time to see if he would be interested in selling both Stereolithography.com and Lasersintering.com (collectively "Primary Domains") and their related businesses. Plaintiff again declined.  [Id. at ¶¶ 35-36.]  Plaintiff asserts that 3D Systems invented the stereolithography process and was a major participant in the stereolithography and laser sintering sectors of the industry.  Nevertheless, 3D Systems did not own the domain names "Stereolithography.com" and "Lasersintering.com", which were valuable to 3D Systems.

3

Plaintiff declined to sell his Primary Domains to 3D Systems when a representative called him in Hawai`i on April 6, 2010. [<u>Id.</u> at ¶¶ 37-41.]

Plaintiff alleges that, in mid-February 2011, Abraham Reichental, President and CEO of 3D Systems, invited Plaintiff and Deelip Menezes to 3D Systems's corporate headquarters in Rock Hill, South Carolina to discuss Print3D Corporation ("Print3D"), which Plaintiff and Menezes own.  On February 17, 2011, Plaintiff and Menezes met with Reichental, Senior Vice President and Chief Financial Officer Damon Gregoire, and other 3D Systems representatives in Rock Hill to discuss. Plaintiff alleges that, during this meeting, 3D Systems told Plaintiff and Menezes that it was interested in acquiring Print3D's assets, and the parties agreed on a purchase price of $10 million. [<u>Id</u> at ¶¶ 42-44.]  Plaintiff also informed Reichental that he was undergoing daily chemotherapy treatments for leukemia, which he had been diagnosed with in September 2009. The Complaint asserts that, due to the progression of Plaintiff's leukemia, he was interested in selling Print3D. [<u>Id.</u> at ¶ 45.]

Plaintiff alleges that, on March 27, 2011, Reichental called Plaintiff in Hawai`i to ask whether Plaintiff was interested in selling his Primary Domains to 3D Systems. [<u>Id.</u> at ¶ 46.]  During that phone call, Plaintiff told Reichental that he would meet with him and other 3D Systems representatives to

4

discuss the possible sale of his Primary Domains.  Plaintiff
alleges that, at this time, he was still undergoing daily
chemotherapy treatments, which affected his mental health.  The
parties agreed to meet in Los Angeles, California, in early
April 2011.  The Complaint asserts that, by April 2011, Plaintiff
was receiving annual license fees of approximately $150,000 for
Stereolithography.com, pursuant to a non-exclusive license
agreement with non-party Cranston LLC ("Cranston").  [Id. at
¶¶ 47-50.]  Plaintiff was also receiving approximately $100,000
annually for Lasersintering.com, pursuant to a non-exclusive
license agreement with non-party Additive Manufacturing LLC
("Additive").  [Id. at ¶ 51.]

　　　　　The Complaint alleges that, on April 3, 2011, Plaintiff
and Menezes met with Gregoire, and in-house counsel for 3D
Systems, Andrew Johnson, in Los Angeles for about three hours and
twenty minutes.  The first three hours of the meeting concerned
the sale of Print3D to 3D Systems.  Menezes then left, and the
remainder of the meeting was between Plaintiff, Gregoire, and
Johnson, regarding the sale of the Primary Domains to 3D Systems.
[Id. at ¶¶ 52-53.]  The Complaint alleges that, during this
portion of the meeting, Gregoire confirmed that Plaintiff should
receive between $5 million and $10 million for the sale of his
Primary Domains to 3D Systems.  [Id. at ¶ 54.]  Gregoire invited
Plaintiff to meet with him and Reichental again on April 5, 2011.

At their first meeting on April 5, Gregoire emailed Plaintiff a summary of 3D Systems's valuation of Lasersintering.com and Plaintiff's interest in the Print3D assets. [Id. at ¶¶ 55-57 (citing id., Exh. A).] Plaintiff alleges that this summary valued Lasersintering.com at $1,649,322, and that the summary did not include a valuation of Stereolithography.com, which was generating approximately fifty percent more income. [Id. at ¶ 58.]

Later that same day, the parties met again, and Plaintiff alleges that Gregoire and Reichental told him that 3D Systems wanted to structure the sale of the Primary Domains "as a 'buy-out' so that a relatively small amount of the purchase price would be paid on the closing, with the balance of most of the purchase price for the Primary Domains to be paid over a period of time based on revenues generated by the Primary Domains' businesses after the closing of the sale." [Id. at ¶¶ 59-60.] Gregoire and Reichental also told Plaintiff that, in addition to the Primary Domains, 3D Systems wanted to purchase related domain names ("Defensive Domains").[1] [Id. at ¶ 61.] According to Gregoire and Reichental, $6 million represented a fair price for the Web Domains, and Plaintiff would make more than that through the buy-out mechanism. Plaintiff alleges that, in order to

_____

[1] The Court will refer to the Primary Domains and the Defensive Domains collectively as "Web Domains."

induce him to accept the proposed buy-out structure, Gregoire and Reichental represented that, after acquisition, 3D Systems would "make a substantial commitment of resources to the Web Domains' businesses to ensure that Plaintiff would receive the $6 million plus purchase price for the sale of his Web Domains." [Id. at ¶¶ 62-63.]  Furthermore, Gregoire and Reichental represented that Lasersintering.com's existing license agreement with Additive would remain in place after the close of the sale.  Gregoire and Reichental indicated that 3D Systems would likely terminate Stereolithography.com's license agreement with Cranston.  In order to induce Plaintiff to sell the Web Domains, however, they assured Plaintiff that 3D Systems would replace the lost Cranston revenue with a revenue stream that exceeded the current $150,000 annual income from Cranston.  [Id. at ¶ 64.]

Plaintiff alleges that Gregoire wrote an outline of the structure for the purchase price of the Web Domains: "first, a buyout based on the initial $250,000 of revenue generated by the Primary Domains; second, on development of the Web Domains; and third, on the $225,000 annual compensation to be paid to Plaintiff." [Id. at ¶ 65 (citing id., Exh. B.]  In order to further induce Plaintiff, Gregoire and Reichental told Plaintiff that 3D Systems would employ him as a manager for a period of five years, at an annual salary of $150,000, plus an annual bonus of $75,000.  [Id. at ¶ 66 (citing id., Exh. A).]

7

Plaintiff informed Gregoire and Reichental that, pursuant to its licensing agreement, Additive had a right of first refusal to purchase Lasersintering.com.  Plaintiff said that he needed to provide Additive with the proposed purchase price so that Additive could then decide whether to exercise its right of first refusal.  After the meeting, Gregoire sent Plaintiff an email indicating that 3D Systems would pay $1,649,000 to purchase Lasersintering.com.  [Id. at ¶¶ 67-69 (citing id., Exh. C).]  Additive declined to exercise its right of first refusal.  [Id. at ¶ 70.]

Even later that day, April 5, 2011, 3D Systems prepared a three-page letter of agreement regarding the sale of the Web Domains ("Agreement Letter"), which Plaintiff and Reichental, on behalf of 3D Corp., executed.  [Id. at ¶¶ 71-73; id., Exh. D at 4.]  The Agreement Letter provided, inter alia, that: 3D Systems would pay Plaintiff $250,000 in cash at closing, plus a portion of all license fees and royalties that the Web Domains generated; 3D Systems would pay Plaintiff a buy-out related to the Web Domains based on royalties that the Web Domains generated over the five-year period following the closing; 3D Systems would support Plaintiff's continued web development efforts; 3D Systems would employ Plaintiff as a manager of Print3D; and 3D Systems would grant 5,000 shares of its restricted common stock to Plaintiff.  [Id. at ¶¶ 74-77.]

8

Plaintiff alleges that, in executing the Agreement Letter, he relied upon Reichental and Gregoire's representations that 3D Systems would: commit substantial resources to the Web Domains so that Plaintiff would be paid the $6 million purchase price through the buy-out; replace the Cranston revenue with a higher revenue stream; and employ Plaintiff as a manager of 3D Systems for a period of five years at an annual salary of $225,000.  Plaintiff contends that he would not have executed the Agreement Letter had he known that 3D Systems had no intention of honoring these representations.  Furthermore, Plaintiff executed the Agreement Letter with the understanding that he would be able to work primarily from Hawai`i.  [Id. at ¶¶ 78-80.]

On April 19, 2011, Plaintiff met with Gregoire and other 3D Systems representatives to execute the Purchase and Sale Agreement ("PSA"), which detailed the terms of the sale of the Web Domains to 3D Systems.  This meeting took place at 3D Systems's corporate office in Rock Hill.  [Id. at 83 (citing id., Exh. E).]  The Complaint alleges:

> Consistent with the [Agreement Letter], the [PSA] provided for the sale of the Web Domains to Defendant 3D Systems for an initial payment of $250,000 plus license fees and royalties and a buy-out for each Primary Domain "based on average royalty generated by such Primary Domain over the previous two year reporting period . . . calculated over a five year period present valued back at an applicable interest rate."

[Id. at ¶ 84 (quoting id., Exh. E at 2)(some alterations in

Complaint).]  The Agreement Letter also contained a non-compete clause that prohibited Plaintiff from competing with the Web Domains for a five-year period.  Plaintiff alleges that, in executing the PSA, he relied upon Reichental and Gregoire's representations that 3D Systems would: commit substantial resources to the Web Domains so that Plaintiff would be paid the $6 million purchase price through the buy-out; generate annual income in excess of $150,000 from Stereolithography.com during the buy-out; and employ Plaintiff as a manager of 3D Systems for five years at an annual salary of $225,000.  Plaintiff contends that he would not have executed the PSA had he known that 3D Systems had no intention of honoring these representations.  Plaintiff asserts that, because he trusted Reichental and Gregoire, he did not retain or consult with an attorney regarding the Web Domains transaction.  Plaintiff executed the PSA on April 19, 2011.  Although Reichental executed the Agreement Letter on behalf of 3D Corp., Gregoire executed the PSA on behalf of 3D Inc.  [Id. at ¶¶ 85-88.]

After the closing of the Web Domains sale, and pursuant to the Agreement Letter, 3D Systems employed Plaintiff as a manager of Print3D at an annual salary of $150,000.  Plaintiff alleges that he believed that, pursuant to the Agreement Letter and the PSA, his employment was to be for a five-year period in order to maximize the amount that he would be paid through the

buy-out.  Plaintiff asserts that, as a manager of Print3D, he made a good faith attempt to manage and develop the Web Domains. Plaintiff alleges that, throughout his employment, he made numerous requests to 3D Systems to honor its promises to commit resources to the Web Domains, but 3D Systems refused.  [Id. at ¶¶ 89-92.]  Plaintiff contends that 3D Systems never intended to honor the promises and representations that Reichental and Gregoire made to Plaintiff.  Rather, Reichental and Gregoire conspired with each other to purchase the Web Domains at a discounted price, while ensuring that Plaintiff could not compete with the Web Domains.  Reichental and Gregoire made false promises and representations in order to induce Plaintiff to execute the Agreement Letter and the PSA.  [Id. at ¶¶ 93-95.]

Plaintiff alleges that, after the closing of the Web Domains sale, 3D Systems terminated Cranston's license agreement with Stereolithography.com.  3D Systems did not attempt to run Stereolithography.com as a separate business, and instead used the "Stereolithography.com" domain name "as a portal to funnel business to other subsidiaries or divisions" of 3D Systems.  [Id. at ¶¶ 96-97.]  Plaintiff contends that 3D Systems failed and refused to account for the revenues it earned for its use of Stereolithography.com.  From the time of the Web Domains sale through February 15, 2013, 3D Systems paid Plaintiff $46,711 in licensing fees and royalties that the Web Domains generated,

which was virtually all from the Additive license agreement.
Plaintiff asserts that, after its purchase of the Web Domains, 3D
Systems neither supported the Primary Domains as an independent
business nor generated the necessary revenue to pay Plaintiff the
full value that he had bargained for when he sold the Web
Domains.  [Id. at ¶¶ 98-101.]

On February 15, 2013, Plaintiff received a phone call
from Kimberly Hale ("Hale"), the head of 3D Systems's human
resources department.  Hale informed Plaintiff that his
employment was terminated, effective that day, but offered no
reason for his termination.  Plaintiff assert thats, prior to his
termination, Plaintiff had not received any complaints regarding
his performance.  [Id. at ¶¶ 102-03.]

Plaintiff filed his Complaint against Defendants on
August 23, 2013. [Dkt. no. 1.]  The Complaint asserts the
following causes of action: breach of contract against 3D Systems
("Count I"); breach of employment agreement against 3D Systems
("Count II"); breach of the covenant of good faith and fair
dealing against 3D Systems ("Count III"); fraud against all
Defendants ("Count IV"); negligent misrepresentation against all
Defendants ("Count V"); unjust enrichment against 3D Systems
("Count VI"); rescission against 3D Systems ("Count VII").

The Complaint seeks the following relief: an entry of
judgment in favor of Plaintiff and against 3D Systems with

12

respect to Counts I-VII; damages from 3D Systems in the amount of $7,818,000; an entry of judgment in favor of Plaintiff against Reichental and Gregoire with respect to Count IV and Count V; damages from all Defendants in the amount of $7,818,000 for Count IV and Count V; a judgment ordering the "release of any and all of Plaintiff's shares of restricted common stock, together with interest[;]" [id. at pg. 28;] punitive damages; and attorneys' fees and costs.  As an alternative to damages, the Complaint seeks rescission of the Agreement Letter and the PSA.

**STANDARD**

I.   **Personal Jurisdiction**

This district court has stated:

A plaintiff has the burden of establishing personal jurisdiction over a nonresident defendant.  See Love v. Associated Newspapers, Ltd., 611 F.3d 601, 608 (9th Cir. 2010); Schwarzenegger v. Fred Martin Motor Co., 374 F.3d 797, 800 (9th Cir. 2004).  A plaintiff must establish personal jurisdiction over a defendant with respect to each claim.  Action Embroidery Corp. v. Atl. Embroidery, Inc., 368 F.3d 1174, 1180 (9th Cir. 2004) ("Personal jurisdiction must exist for each claim asserted against a defendant." (citing Data Disc, Inc. v. Sys. Tech. Assocs., Inc., 557 F.2d 1280, 1289 n.8 (9th Cir. 1977)).

When, as here, a district court acts on a motion to dismiss without holding an evidentiary hearing, a plaintiff need only make a prima facie showing of jurisdictional facts to withstand the motion to dismiss.  Love, 611 F.3d at 608; Schwarzenegger, 374 F.3d at 800.  Although a plaintiff may not simply rest on the bare allegations of the complaint, uncontroverted allegations in the complaint must be taken as true, and conflicts between parties over statements contained in affidavits or declarations

13

must be resolved in the plaintiff's favor.  <u>See</u>
<u>Love</u>, 611 F.3d at 608; <u>Schwarzenegger</u>, 374 F.3d at
800.

<u>Maui Elec. Co. v. Chromalloy Gas Turbine, LLC</u>, 942 F. Supp. 2d

1035, 1040 (D. Hawai`i 2013).

## II.  <u>Transfer Venue</u>

"Under § 1404(a), the district court has discretion to

adjudicate motions for transfer according to an individualized,

case-by-case consideration of convenience and fairness." <u>Jones</u>

<u>v. GNC Franchising, Inc.</u>, 211 F.3d 495, 498-99 (9th Cir. 2001)

(quoting <u>Stewart Org., Inc. v. Ricoh Corp.</u>, 487 U.S. 22, 29, 108

S. Ct. 2239, 101 L. Ed. 2d 22 (1988)) (quotation marks omitted).

The purpose of transfer under § 1404(a) is to "'prevent the waste

of time, energy, and money,' and 'to protect litigants,

witnesses, and the public against unnecessary inconvenience and

expense.'" <u>See</u> <u>Kawamoto v. CB Richard Ellis, Inc.</u>, 225 F. Supp.

2d 1209, 1213 (D. Hawai`i 2002) (quoting <u>Lung v. Yachts Int'l</u>,

980 F. Supp. 1362, 1369 (D. Hawai`i 1997)).  To transfer a case,

a defendant must first show that the transferee court is one in

which the action could have been commenced originally.  Second, a

defendant must show that transfer would result in greater

convenience to the parties and witnesses, as well as advance the

interest of justice.  28 U.S.C. § 1404(a).

## DISCUSSION

### I.   Count II

        As an initial matter, the Court notes Defendants'
argument that Count II should be dismissed because it is
identical to the claim that Plaintiff and Print3D assert
in Barranco, et al. v. 3D Sys. Corp., et al., CV 13-00411 LEK-RLP
("CV 13-00411 Action").   Defendants also argue that the
respective claim in the CV 13-00411 Action is subject to
arbitration.   [Mem. in Supp. of Motion at 21-23.]   In light of
Defendants' arguments, Plaintiff stipulates that Count II should
be dismissed against all Defendants.   [Mem. in Opp. at 29.]   The
Court HEREBY DISMISSES Count II WITHOUT PREJUDICE.

### II.   Personal Jurisdiction

        Defendants argue that the Complaint should be dismissed
for lack of personal jurisdiction over all Defendants.   [Motion
at 1.]

        With respect to establishing personal jurisdiction,
this district court has stated:

                The district court considers two factors
        before exercising personal jurisdiction over a
        nonresident defendant in a diversity of
        citizenship case: "(1) whether an applicable state
        rule or statute potentially confers jurisdiction
        over the defendant; and (2) whether assertion of
        such jurisdiction accords with constitutional
        principles of due process." Flynt Distrib. Co. v.
        Harvey, 734 F.2d 1389, 1392 (9th Cir. 1984). "The
        jurisdictional inquiries under state law and
        federal due process merge into one analysis" when,
        as here, the state's long-arm statute is "co-

extensive with federal due process requirements."
Roth v. Garcia Marquez, 942 F.2d 617, 620 (9th
Cir. 1991).   See Cowan v. First Ins. Co. Of
Hawaii, 61 Haw. 644, 649, 608 P.2d 394, 399 (1980)
(Hawaii's long-arm statute, Haw. Rev. Stat. § 634-
35, was adopted to expand the jurisdiction of
Hawaii's courts to the extent permitted by the due
process clause of the Fourteenth Amendment). . . .

     The Due Process Clause protects a person's
"liberty interest in not being subject to the
binding judgments of a forum with which he has
established no meaningful 'contacts, ties, or
relations.'"   Burger King Corp. v. Rudzewicz, 471
U.S. 462, 471-72 (1985) (quoting Int'l Shoe Co. v.
Washington, 326 U.S. 310, 319 (1945)).   The Due
Process Clause requires that defendants have
"certain minimum contacts with [Hawaii] such that
the maintenance of the suit does not offend
traditional notions of fair play and substantial
justice."   Int'l Shoe, 326 U.S. at 316; Data Disc,
Inc. v. Systems Tech. Assocs., Inc., 557 F.2d
1280, 1287 (9th Cir. 1977).   The minimum contacts
required mean that the defendant must have
purposefully availed itself of the privilege of
conducting activities within the foreign
jurisdiction, thereby invoking the benefits and
protections of the foreign jurisdiction's laws.
See Asahi Metal Indus. Co. v. Sup. Court of Cal.,
480 U.S. 102, 109 (1987).   In applying Due Process
Clause requirements, courts have created two
jurisdictional concepts – general and specific
jurisdiction.

     A court may exercise general jurisdiction
over the defendant when the defendant is a
resident or domiciliary of the forum state, or the
defendant's contacts with the forum state are
continuous, systematic, and substantial.
Helicopteros Nacionales de Columbia, S.A. v. Hall,
466 U.S. 408, 414-16 [104 S. Ct. 1868, 80 L. Ed.
2d 404 (1984); Data Disc, 557 F.2d at 1287 . . . .

     . . . .

     Specific jurisdiction, on the other hand, may
be found when the cause of action arises out of
the defendant's contact or activities in the forum
state.   See Roth v. Garcia Marquez, 942 F.2d 617,
620 (9th Cir. 1991); Data Disc, 557 F.2d at 1287.
To ensure that the exercise of specific

16

jurisdiction is consistent with due process in this particular case, this court must be satisfied that the following have been shown:

> 1) the nonresident defendant must have purposefully availed himself of the privilege of conducting activities in the forum by some affirmative act or conduct; 2) plaintiff's claim must arise out of or result from the defendant's forum-related activities; and 3) exercise of jurisdiction must be reasonable.

Roth, 942 F.2d at 620-21.

Maui Elec., 942 F. Supp. 2d at 1041-42 (footnote omitted) (some alterations in Maui Elec.).

Plaintiff concedes that this Court may not exercise general jurisdiction over Defendants.  Rather, Plaintiff argues that Defendants' contacts with Hawai`i are sufficient to establish specific jurisdiction.  [Mem. in Opp. at 5.]  The Court will assess whether each of the Defendants has sufficient minimum contacts with Hawai`i.  See Kukui Gardens Corp. v. Holco Capital Grp., Inc., 664 F. Supp. 2d 1103, 1111 (D. Hawai`i 2008) (quoting Calder v. Jones, 465 U.S. 783, 790, 104 S. Ct. 1482, 79 L. Ed. 2d 804 (1984)) ("*Each defendant's contacts with the forum State must be assessed individually.*" (emphasis in Kukui)).  To the extent that the Complaint alleges that Defendants committed the same conduct, the Court will consolidate its analysis when appropriate.

A.   **Purposeful Availment**

Defendants argue that this Court lacks specific jurisdiction over Reichental and Gregoire.  [Mem. in Supp. of Motion at 9-11.]  In determining whether a defendant has purposefully availed himself of the laws of the forum, the analysis differs with respect to tort claims and contract claims.

1.   **Tort Claims**

> In tort cases, the Ninth Circuit, sitting *en banc*, has stated that a defendant purposefully avails itself of a forum in the following circumstances: "the defendant allegedly must have (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state."  Yahoo! Inc. v. La Lique Contre Le Racisme Et L'Antisemitisme, 433 F.3d 1199, 1206 (9th Cir. 2006) (*en banc*) (formatting omitted). The Ninth Circuit has explained that the third prong is satisfied when a defendant's intentional act has "foreseeable effects" in the forum. Brayton Purcell LLP v. Recordon & Recordon, 606 F.3d 1124, 1131 (9th Cir. 2010). . . .

Maui Elec., 942 F. Supp. 2d at 1042 (footnote omitted).

a.   **Reichental and Gregoire**

i.   **Intentional Act**

Plaintiff alleges that Reichental and Gregoire made false promises and representations to Plaintiff in order to induce him to sell his Web Domains to 3D Systems.  [Complaint at ¶¶ 63-64, 66, 78-79, 86, 93-95.]  Defendants have not offered any evidence to deny these allegations.  Thus, taking the allegations of the Complaint as true, the Court finds that Plaintiff has

established that Reichental and Gregoire both committed an intentional act.

### ii.  **Expressly aimed at the forum state**

In determining whether Reichental and Gregoire's conduct was expressly aimed at Hawai`i, the Court notes that Defendants emphasize that the Complaint does not allege that Reichental or Gregoire made any representations to Plaintiff while Plaintiff was in Hawai`i.  [Mem. in Supp. of Motion at 10-11.]  Reichental and Gregoire both contend that, at all relevant times to the instant action, they never met or communicated with Plaintiff while Plaintiff was in Hawai`i.  [Id., Declaration of Abraham Reichental ("Reichental Decl.") at ¶ 16; id., Declaration of Damon Gregoire ("Gregoire Decl.") at ¶ 21.]  Reichental acknowledges that one possible exception to his statement is a phone call that he made to Plaintiff regarding a future meeting, but Reichental says that he is unsure as to whether Plaintiff was in Hawai`i at that time.  [Reichental Decl. at ¶ 16.]  Gregoire states that his only interactions with Plaintiff took place in California and South Carolina.  [Gregoire Decl. at ¶ 22.]

"[T]he Ninth Circuit has repeatedly stated that the 'express aiming' requirement is satisfied, and specific jurisdiction exists, 'when the defendant is alleged to have engaged in wrongful conduct targeted at a plaintiff whom the defendant knows to be a resident of the forum state.'"  Trade W.,

Inc. v. Dollar Tree, Inc., Civ No. 12-00606 ACK-BMK, 2013 WL
1856302, at *5 (D. Hawai`i April 30, 2013) (other citations and
quotation marks omitted) (quoting Dole Food Co. v. Watts, 303
F.3d 1104, 1111 (9th Cir. 2002)).  Thus, Plaintiff can satisfy
this prong by alleging that Reichental and Gregoire engaged in
wrongful conduct targeted at Plaintiff, knowing that Plaintiff is
a Hawai`i resident.

Plaintiff's evidence demonstrates that Reichental and
Gregoire knew that Plaintiff was a Hawai`i resident at the time
of their alleged wrongful conduct.  Plaintiff states that all
Defendants were aware that he lived on the island of Maui.  [Mem.
in Opp., Declaration of Ronald Barranco ("Barranco Decl.") at
¶ 14.]  In addition, Plaintiff contends that Gregoire said that
Plaintiff would be able to fulfill his employment agreement with
3D Systems from Hawai`i, without having to move to South
Carolina.  [Id. at ¶ 16; Complaint at ¶ 80.]  Plaintiff alleges
that the parties agreed to meet in Los Angeles for their
April 2011 meeting partly because Los Angeles is midway between
Hawai`i and South Carolina.  [Complaint at ¶ 49.]  Johnson states
that, based on Plaintiff's representations, he believed that
Plaintiff resided in both Hawai`i and California.  [Reply,
Declaration of Andrew Johnson ("Johnson Decl.") at ¶ 8.]  To the
extent that any conflicts exist between Plaintiff's evidence and
Defendants' evidence, they must be resolved in Plaintiff's favor.

See Love, 611 F.3d at 608; Schwarzenegger, 374 F.3d at 800.
Thus, the Court finds that Plaintiff has presented sufficient
allegations and evidence to show that Reichental and Gregoire's
conduct was expressly aimed at Hawai`i.

### iii. **Causing harm that is known to likely be suffered in the forum state**

Plaintiff's evidence also demonstrates that Reichental
and Gregoire knew that any harm that Plaintiff suffered as a
result of their alleged wrongful conduct would be in Hawai`i.  As
discussed above, Plaintiff's evidence shows that Reichental and
Gregoire knew that Plaintiff was a Hawai`i resident, and that he
would remain in Hawai`i while working for 3D Systems.  [Barranco
Decl. at ¶¶ 14, 16.]  Thus, Reichental and Gregoire reasonably
understood that their alleged wrongful conduct would potentially
cause Plaintiff to suffer harm in Hawai`i.  The Court therefore
finds that, under the tort analysis, Plaintiff has satisfied his
burden in establishing the purposeful availment prong with
respect to Reichental and Gregoire.

### b.   3D Systems

Plaintiff alleges that 3D Inc. is a wholly owned
subsidiary of 3D Corp., that 3D Inc. is the agent of 3D Corp.,
and that 3D Corp. transacts business on behalf of 3D Inc.
[Complaint at ¶¶ 28, 34.]  Plaintiff also alleges that Reichental
and Gregoire are both employees and officers of both 3D Inc. and
3D Corp.  [Id. at ¶¶ 5-6.]  Reichental executed the Agreement

Letter on behalf of 3D Corp.  [Id., Exh. D at 4.]  Gregoire

executed the PSA on behalf of 3D Inc.  [Id. at ¶ 88; id., Exh. E

at 6.]  Further, Plaintiff's claims against Reichental and

Gregoire are based on the alleged representations they made to

Plaintiff in their official capacities on behalf of 3D Systems.

[Id. at ¶¶ 61-64, 80, 86, 88.]  In fact, Reichental states that,

at all times relevant to the Complaint, "I was acting in the

scope of my employment and in my official capacity with 3D

Systems."  [Reichental Decl. at ¶ 19.]  Gregoire states the same.

[Gregoire Decl. at ¶ 24.]

> This district court has stated:
>
> The Court's jurisdiction over an agent imputes to
> the foreign principal when the agent's conduct, on
> behalf of the principal, gives rise to the cause
> of action.  See Wells Fargo & Co. v. Wells Fargo
> Express Co., 556 F.2d 406, 414 (9th Cir. 1977);
> Sher [v. Johnson], 911 F.2d [1357, 1362 (9th Cir.
> 1990)] ("For purposes of personal jurisdiction,
> the actions of an agent are attributable to the
> principal."). . . Agency, in this context, is
> determined by the state law of the forum.

Rollins v. Maui Dreams Dive Co., Civ. No. 10-00336 HG-KSC, 2011

WL 1299688, at *5 (D. Hawai`i Mar. 31, 2011); see also Resnick v.

Rowe, 283 F. Supp. 2d 1128, 1139 (D. Hawai`i 2003) (quoting

Sher); Chan v. ResortQuest Park City, LLC, No. CIV. S-11-420 FCD,

2011 WL 3555624, at *4 (E.D. Cal. Aug. 11, 2011) ("The Ninth

Circuit has imputed the contacts of an agent to its principal

corporation where there was a subsidiary or employer-employee

relationship.").

Plaintiff does not expressly allege that Reichental and Gregoire are "agents" of 3D Systems.  Nevertheless, the Court finds that, in taking the allegations in the Complaint as true, and considering Reichental and Gregoire's own statements, Plaintiff is entitled to a reasonable inference that Reichental and Gregoire were agents of 3D Systems.  Thus, insofar as the Court has specific personal jurisdiction over Reichental and Gregoire with respect to Plaintiff's tort claims, jurisdiction is imputed to 3D Systems.

### 2.  <u>Contract Claims</u>

Plaintiff only asserts his contract claims against 3D Systems.  In support of their argument that this Court lacks personal jurisdiction over 3D Systems, Defendants emphasize that neither the Agreement Letter negotiations nor the PSA negotiations took place in Hawai`i.  [Mem. in Supp. of Motion at 14-15 (citing Complaint at ¶¶ 42-44, 52-53, 59-60).]  Plaintiff argues that 3D Systems purposefully availed itself with respect to the contract claims because 3D Systems directly solicited Plaintiff's business in Hawai`i, and the resulting Agreement Letter and PSA created continuing obligations between the parties.  [Mem. in Opp. at 14.]

In contract cases,

> "[a] contract with an effect in the forum state
> does not, by itself, automatically establish the
> minimum contacts necessary for the exercise of
> personal jurisdiction over a nonresident

> defendant.  <u>Burger King</u>, 471 U.S. at 478.
> Instead, a court must examine the circumstances
> surrounding the contract in determining whether
> there have been the required minimum contacts.
> Accordingly, this court examines "prior
> negotiations and contemplated future consequences,
> along with the terms of the contract and the
> parties' actual course of dealing."  <u>See</u> <u>id.</u> at
> 479.  "Parties who 'reach out beyond one state and
> create continuing relationships and obligations
> with citizens of another state' are subject to
> regulation and sanctions in the other State for
> the consequences of their activities."  <u>Id.</u> at 473
> (quoting <u>Travelers Health Ass'n v. Virginia</u>, 339
> U.S. 643, 647 (1950)).  "Thus, if the defendant
> directly solicits business in the forum state, the
> resulting transactions will probably constitute
> the deliberate transaction of doing business
> invoking the benefits of the forum state's laws."
> <u>Decker Coal Co. v. Commonwealth Edison Co.</u>, 805
> F.2d 834, 840 (9th Cir. 1986).

<u>Dinnerman v. Douter Coffee Co.</u>, Civil No. 07-00164 SOM-BMK, 2007 WL 1701919, at *6 (D. Hawai`i June 8, 2007).

Plaintiff alleges that 3D Systems directly solicited his business by telephone in Hawai`i on March 27, 2011. [Complaint at ¶ 46.]  This phone call led to a meeting between Plaintiff and 3D Systems soon thereafter in Los Angeles, in order to further discuss the sale of the Web Domains.  [<u>Id.</u> at ¶¶ 46-47, 49.]  Within sixteen days of their meeting, Plaintiff and 3D Systems executed both the Agreement Letter and the PSA.  [<u>Id.</u> at ¶¶ 72, 83.]  Both contracts provide that, as part of the sale agreement, 3D Systems would continue to divide all Web Domains' license fees and royalties with Plaintiff.  [<u>Id.</u>, Exh. D at 2; <u>id.</u>, Exh. E at 2.]  In addition, the sale would be structured as a buyout, based on the average royalty generated by each respective Primary Domain.  Plaintiff could exercise his buyout

24

rights at any time after the PSA's execution, and 3D Systems could exercise its buyout rights at anytime after the fifth anniversary of the PSA's execution.  [Id.]  Plaintiff alleges that 3D Systems also agreed to employ him, and prohibited him from competing with the Web Domains, for a period of five years. [Id. at ¶¶ 66, 78, 85-86.]  Furthermore, the PSA requires Plaintiff to indemnify 3D Systems if anyone were to claim that any of the Web Domains infringed on their patent.  [Id., Exh. E at 3.]

In examining the circumstances surrounding the Agreement Letter and the PSA, despite the fact that the negotiations and executions of the contracts did not take place in Hawai`i, Plaintiff's factual allegations show that 3D Systems contemplated future contacts with Hawai'i.  3D Systems not only agreed to continue to share the revenue that the Web Domains' license fees and royalties generated, but also to employ Plaintiff for five years.  In exchange, *inter alia*, Plaintiff was obligated to indemnify 3D Systems in the event of a patent infringement suit and refrain from competing with the Web Domains for five years.  Defendants have not presented evidence to the contrary.  Taking all the allegations as true, the Court finds that 3D Systems did not simply purchase the Web Domains from Plaintiff.  Rather, 3D Systems reached out beyond South Carolina and structured the transaction so as to create a continuing relationship and obligations with Plaintiff in Hawai`i, and should therefore be subject to regulation and sanctions in

25

Hawai`i for the consequences of their activities.  Thus, the
Court concludes that Plaintiff has met his burden in establishing
that 3D Systems purposefully availed itself of Hawai`i laws with
respect to Plaintiff's contract claims.

B.   **Arising out of forum-related activities**

In determining whether Plaintiff's claims "arise out
of" Defendants' alleged forum-related activities, "[c]ourts in
the Ninth Circuit use a 'but for' test[.]"  Trade W., 2013 WL
1856302, at *7 (citing Menken v. Emm, 503 F.3d 1050, 1058 (9th
Cir. 2007)).  Here, Defendants' alleged forum-related activities
revolve around the formation and execution of the Agreement
Letter and the PSA.  Insofar as Plaintiff's claims are directly
based on the Agreement Letter and the PSA, the Court finds that
Plaintiff's claims arise out of Defendants' forum-related
activities.

C.   **Reasonableness of exercise of jurisdiction**

Plaintiff has satisfied both the first and second
prongs of the specific jurisdiction analysis.  Thus, the burden
now shifts to Defendants to "'present a compelling case that the
exercise of jurisdiction would not be reasonable.'"  Id. (other
citation and internal quotation marks omitted) (quoting
Schwarzenegger, 374 F.3d at 801-02).  In determining whether
exercise of jurisdiction is reasonable so as to comport with fair
play and substantial justice, courts must consider the following
factors:

(1) the extent of the defendants' purposeful interjection into the forum state's affairs;

(2) the burden on the defendant of defending in the forum;

(3) the extent of conflict with the sovereignty of the defendants' state;

(4) the forum state's interest in adjudicating the dispute;

(5) the most efficient judicial resolution of the controversy;

(6) the importance of the forum to the plaintiff's interest in convenient and effective relief; and

(7) the existence of an alternative forum.

Fiore [v. Walden], 688 F.3d [558, 583-84 (9th Cir. 2011)].  The Court balances all seven factors, recognizing that none of the factors is dispositive in itself.  Id.

Id.

### 1.  **Purposeful interjection**

"The Ninth Circuit has recognized that 'circumstances may exist where the level of purposeful injection into the forum supports a finding of purposeful availment yet still weighs against the reasonableness of jurisdiction.'"  Id. (internal quotation marks omitted) (quoting Fiore, 688 F.3d at 583).  "'The smaller the element of purposeful interjection, the less is jurisdiction to be anticipated and the less reasonable its exercise.'"  Id. (quoting Ins. Co. Of N. Am. v. Marina Salina Cruz, 649 F.2d 1266, 1271 (9th Cir. 1981)).  It is undisputed that Defendants never traveled to Hawai`i to meet Plaintiff in

27

connection with the Agreement Letter or the PSA.   Plaintiff argues, as he did in support of his purposeful availment analysis, that this factor is satisfied because Defendants solicited business with a Hawai`i resident.   The intangible nature of the Web Domains, however, suggests that Defendants' solicitation was unrelated to his Hawai`i residency.   Johnson states that "3D Systems accommodated Plaintiff's request to work from home, whether that be in California or Hawai`i."   [Johnson Decl. at ¶ 10.]   Resolving any disputes in Plaintiff's favor requires a finding that Defendants knew Plaintiff would work from his home in Hawai`i.   Nevertheless, Johnson's statement indicates that Plaintiff could also have fulfilled his employment with 3D Systems in California.   Thus, the Court finds that the level of Defendants' purposeful interjection into Hawai`i is slight, and that this factor weighs in favor of Defendants.

### 2.   **Burden on Defendants**

The Court recognizes that Defendants will be burdened by having to litigate in Hawai`i, as they are all South Carolina residents.   The Court also recognizes, however, that "unless the 'inconvenience is so great as to constitute a deprivation of due process, it will not overcome clear justifications for the exercise of jurisdiction.'"   Panavision Int'l, LP v. Toeppen, 141 F.3d 1316, 1323 (9th Cir. 1998) (other citation omitted) (quoting Caruth v. International Psychoanalytical Ass'n, 59 F.3d 126, 128-

29 (9th Cir. 1995)).   Furthermore, this district court "has

observed that '[r]ecent advancements in communication and

transportation . . . have greatly reduced the inconvenience once

associated with defending in another forum.'"   <u>Kukui</u>, 664 F.

Supp. 2d at 1116 (alterations in <u>Kukui</u>) (other citation omitted)

(quoting <u>Robinson Corp. v. Auto-Owners Ins. Co.</u>, 304 F. Supp. 2d

1232, 1240 (D. Hawai`i 2003)).   The Court therefore finds that

this factor weighs in favor of Plaintiff.

### 3.   <u>Conflict with sovereignty of Defendants' state</u>

Neither party has presented evidence to show a conflict

with the sovereignty of South Carolina, where Reichental and

Gregoire are residents and where 3D Systems has its principal

place of business.   "Moreover, the sovereignty of a defendant's

state is not a significant consideration in actions between

citizens of the United States."   <u>Trade W.</u>, 2013 WL 1856302, at *8

(citing <u>Decker Coal</u>, 805 F.2d at 841).   Thus, this factor is

neutral.

### 4.   <u>Interest of Hawai`i</u>

This Court recognizes that, as the forum state, "Hawaii

has a strong interest in providing an effective means of redress

for its residents who are tortiously injured."   <u>Resnick</u>, 283 F.

Supp. 2d at 1141 (citation and internal quotation marks omitted).

"A state generally has a 'manifest interest' in providing its

residents with a convenient forum for redressing injuries

inflicted by out-of-state actors." Burger King, 471 U.S. at 473.
Because Plaintiff is a resident of Hawai`i, this factor weighs in
his favor.

### 5. __Judicial efficiency__

The Court notes that "[t]his factor focuses on the
location of the evidence and witnesses[,]" and is "no longer
weighed heavily given the modern advances in communication and
transportation." Panavision, 141 F.3d at 1323 (citing Caruth, 59
F.3d at 129). According to Defendants, witnesses and documentary
evidence are likely located in Rock Hill, South Carolina. Other
3D Systems employees that are potential witnesses are located in
Georgia, Massachusetts, Washington, and India. [Gregoire Decl.
at ¶ 5-7.] Plaintiff argues that Defendants' initial
disclosures, made pursuant to Fed. R. Civ. P. 26(a)(1), reveal
that half of Defendants' potential witnesses are located outside
of South Carolina, and would therefore need to travel even if
Defendants are permitted to litigate in South Carolina. [Mem. in
Opp. at 20-21 (citing id., Declaration of Joachim P. Cox, Exh. 3
at 2-4).] The Court concludes that this factor weighs slightly
in favor of Defendants.

### 6. __Convenient and effective relief for Plaintiff__

Insofar as Plaintiff resides in Hawai`i, Hawai`i would
be a more convenient forum for Plaintiff. The Court acknowledges
Plaintiff's contention that he is currently undergoing

chemotherapy treatments for leukemia, and therefore traveling outside of Hawai`i to litigate this action would greatly inconvenience him.  [Barranco Decl. at ¶¶ 2-7.]  In analyzing this factor, however, "little weight is given to a plaintiff's inconvenience."  Spring Patents, Inc. v. Avon Rubber & Plastics, Inc., 183 F. Supp. 2d 1198, 1208 (D. Hawai`i 2001); see also Panavision, 141 F.3d at 1324.  "A court should place greater significance on the possibility of effective relief."  Spring Pantents, 183 F.3d at 1208 (citation omitted).  Both Hawai`i and South Carolina appear to be able to provide Plaintiff with effective relief for his claims.  Thus, the Court finds that this factor weighs only slightly in favor of Plaintiff.

### 7.   **Existence of an alternative forum**

The parties do not dispute that Plaintiff could have brought the instant action in South Carolina.  [Mem. in Supp. of Motion at 18; Mem. in Opp. at 22.]  Thus, this factor weighs in favor of Defendants.

### 8.   **Balancing of the Factors**

After carefully balancing the seven factors, the Court finds that Defendants have failed to meet their burden of presenting a compelling case that this Court's exercise of jurisdiction over them would be unreasonable.  See Schwarzenegger, 374 F.3d at 801-02.  In other words, this Court's exercise of personal jurisdiction over Defendants is reasonable,

31

and would comport with fair play and substantial justice.   In light of the foregoing, the Court concludes that Plaintiff has satisfied his burden in establishing a *prima facie* case of personal jurisdiction over all Defendants, and with respect to all claims.   The Court HEREBY DENIES the Motion to the extent that it seeks dismissal for lack of personal jurisdiction.

## III.  <u>Transfer of Venue</u>

Alternatively, Defendants move to transfer this action to the United States District Court for the District of South Carolina.   [Motion at 2.]   As mentioned above, Plaintiffs do not dispute that this action could have been brought in South Carolina.   Instead, Plaintiff argues that Defendants cannot satisfy their burden of showing that South Carolina is a more convenient forum.   [Mem. in Opp. at 24.]

This Court must weigh several factors to determine whether to transfer a case pursuant to § 1404(a) including: (1) the plaintiff's choice of forum; (2) the location where the relevant agreements were negotiated and executed; (3) the respective parties' contacts with the forum; (4) the contacts relating to the plaintiff's cause of action in the chosen forum; (5) the differences in the costs of litigation in the two forums; (6) the availability of compulsory process to compel attendance of unwilling non-party witnesses; (7) the ease of access to sources of proof; and (8) the state that is most familiar with

the governing law.  <u>Jones</u>, 211 F.3d at 498-99.  "Ultimately, the moving party has the burden of showing that an alternative forum is the more appropriate forum for the action."  <u>Tamashiro v. Harvey</u>, 487 F. Supp. 2d 1162, 1168 (D. Hawai`i 2006) (citation omitted).

### A.   **Plaintiff's choice of forum**

With respect to the first factor, the Court recognizes that there is a strong presumption in favor of Plaintiff's choice of forum.  <u>See Creative Tech., Ltd. v. Aztech Sys.</u>, 61 F.3d 696, 703 (9th Cir. 1995).  "The defendant must make a strong showing of inconvenience to warrant upsetting the plaintiff's choice of forum."  <u>Decker Coal</u>, 805 F.2d at 843 (citation omitted). Plaintiff chose to file the instant action in Hawai`i, where he is a resident.  The Court therefore finds that this factor weighs in favor of Plaintiff.

### B.   **Location where relevant agreements were negotiated and executed**

The parties do not dispute that both contracts in this action were neither negotiated nor executed in Hawai`i.  The Complaint alleges that the parties negotiated and executed the Agreement Letter in California.  With respect to the PSA, the Complaint alleges that the parties executed it in South Carolina. [Complaint at ¶ 83.]  Reichental and Gregoire confirm this, and further assert that the PSA was also drafted in South Carolina. [Reichental Decl. at ¶ 3; Gregoire Decl. at ¶ 8.]  The Court

notes Plaintiff's allegation that the terms of the PSA regarding the initial payment of $250,000, the license fees and royalties, and the buyout structure were consistent with those already stated in the previously executed Agreement Letter.  [Complaint at ¶ 84.]  Thus, the Court finds that the PSA was at least partially negotiated in California as well.  Thus, based on the record before the Court, this second factor weighs only slightly in favor of Defendants.

C.    <u>**Respective parties' contacts with the forum**</u>

Defendants assert that the third factor weighs in favor of transferring the case because Defendants' contacts with Hawai`i are "limited or non-existent, while Barranco's contacts in and around South Carolina are significant."  [Mem. in Supp. of Motion at 19.]  Defendants' argument, however, merely consists of conclusory statements.  The Complaint alleges that 3D Systems and Gregoire, on behalf of 3D Systems, contacted and solicited business from Plaintiff and Menezes in Hawai`i, in their capacities as the owners of Print3D.  These parties eventually entered into an acquisition agreement, which is the subject of the CV 13-00411 Action.  [Complaint at ¶¶ 42, 53, 81.]  Of course, the Court recognizes that South Carolina is where Reichental and Gregoire reside, and where 3D Systems has its principal place of business.  [Reichental Decl. at ¶ 5; Gregoire Decl. at ¶¶ 3-4, 10.]

34

Plaintiff is a Hawai`i resident, as mentioned above. Despite Defendants' assertions, there is nothing in the record that shows that Plaintiff's contacts with South Carolina extend beyond those he has with Defendants, let alone that they are significant.  Plaintiff says, "apart from Mr. Gregoire and Mr. Reichental, none of the 3D Systems employees that I worked with worked or resided in South Carolina."  [Barranco Decl. at ¶ 19.]  Based on the foregoing, the Court concludes that this factor weighs slightly in favor of Plaintiff.

**D.    Contacts relating to the cause of action in Plaintiff's chosen forum**

With respect to the fourth factor, Defendants again emphasize that the parties executed the PSA in South Carolina. [Mem. in Supp. of Motion at 18.]  Despite having solicited business from Plaintiff in Hawai`i, Defendants did not travel to Hawai`i to negotiate or execute the Agreement Letter or the PSA. Based on the record, a majority of the events giving rise to Plaintiff's cause of action took place in California, and partially in South Carolina.  Thus, the Court finds that this factor weighs slightly in favor of transferring the case.

**E.    Differences in cost of litigation in the two forums**

Defendants argue that the fifth factor weighs in their favor because most of the witnesses in this case are located in South Carolina.  [Mem. in Supp. of Motion at 19 (citing Gregoire Decl. at ¶¶ 5, 7).]  According to Defendants, other potential

witnesses are 3D Systems employees located in Georgia, Massachusetts, Washington, and India.  [Id. (citing Gregoire Decl. at ¶ 6).]  On the one hand, Defendants are correct that the witnesses located on the East Coast would need to travel farther to testify in Hawai`i than in South Carolina.  On the other hand, the Court notes that any witnesses located in Hawai`i, Washington, or India would need to travel farther to testify in South Carolina than in Hawai`i.  Moreover, there is no reason that at least some of these witnesses' testimony cannot be presented by way of videotaped depositions.  Thus, the Court concludes that this factor weighs in favor of maintaining the case in Hawai`i.

  **F.** **The availability of compulsory process**

   Defendants do not assert a specific argument with respect to the sixth factor.  Even Plaintiff contends that this factor is neutral.  Insofar as Defendants have not identified reasons that South Carolina's compulsory process to compel attendance of unwilling non-party witnesses would be preferable to that of Hawai`i, the Court finds that this factor is neutral.

  **G.** **Ease of access to sources of proof**

   In support of their argument for transfer, Defendants contend that a majority of the relevant documents are located in South Carolina.  The Court finds, however, that most, if not all,

36

documents can be easily produced for litigation in Hawai`i at a reasonable cost to Defendants.  Thus, this factor is neutral.

### H.   State most familiar with governing law

With respect to the final factor, the Court notes that Plaintiff's contract and tort claims do not involve areas of law that are unique to either Hawai`i or South Carolina.  There is nothing to suggest that one forum would be more familiar with or more competent to apply the law governing Plaintiff's claims. The Court therefore finds that this factor is neutral.

In considering all of these factors, the Court finds that Defendants have not met their burden to demonstrate a "strong showing of inconvenience to warrant upsetting the plaintiff's choice of forum." Decker Coal, 805 F.2d at 843.  The Court concludes that the relevant factors weigh in favor of maintaining the case in Hawai`i.  Accordingly, the Court HEREBY DENIES the Motion to the extent that it seeks transfer of venue pursuant to 28 U.S.C. § 1404(a).

### CONCLUSION

On the basis of the foregoing, Defendants' Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(2) or, in the Alternative, to Transfer Pursuant to 28 U.S.C. § 1404, filed October 21, 2013, is HEREBY DENIED.

IT IS SO ORDERED.

DATED AT HONOLULU, HAWAII, March 17, 2014.



/s/ Leslie E. Kobayashi

Leslie E. Kobayashi
United States District Judge

RONALD BARRANCO V. 3D SYS. CORP., ET AL.; CV. NO. 13-00412 LEK-RLP; ORDER DENYING DEFENDANTS' MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(2) OR, IN THE ALTERNATIVE, TO TRANSFER PURSUANT TO 28 U.S.C. § 1404