IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

RONALD BARRANCO,                    )    CIVIL NO. 13-00412 LEK-RLP
                                    )
          Plaintiff,                )
                                    )
     vs.                            )
                                    )
3D SYSTEMS CORPORATION, a           )
Delaware corporation, 3D            )
SYSTEMS, INC., a California         )
corporation, ABRAHAM               )
REICHENTAL, DAMON GREGOIRE,         )
                                    )
          Defendants.               )
_____)

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT ON ALL CLAIMS AGAINST THEM**

          Before the Court is Defendants 3D Systems Corporation

("3D Corp."); 3D Systems, Inc. ("3D Inc.," collectively, "3D

Systems"); Abraham Reichental ("Reichental"); and Damon

Gregoire's ("Gregoire," all together "Defendants") Motion for

Summary Judgment on All Claims Against Them ("Motion"), filed on

November 19, 2014.  [Dkt. no. 119.]  Plaintiff Ronald Barranco

("Plaintiff") lodged his memorandum in opposition with the Court

on December 30, 2014,[1] and Defendants filed their reply on

_____

          [1] Plaintiff lodged his opposition and supporting materials
along with a motion to seal on December 30, 2014, but the Clerk's
Office returned the documents when the Court denied the motion to
seal.  [Dkt. nos. 126 (Motion to Seal), 127 (order denying
motion), filed 12/31/14, 130 (order regarding return), filed
1/5/15.]  Plaintiff then filed another motion to seal, but the
court denied the second motion as moot since it had already
returned the documents.  [Dkt. nos. 129, 133.]  Plaintiff
successfully filed his documents, presumably after removing all
                                                   (continued...)

January 6, 2015.  [Dkt. no. 132 (reply).]  This matter came on for hearing on January 20, 2015.  After careful consideration of the Motion, supporting and opposing memoranda, and the arguments of counsel, Defendants' Motion is HEREBY GRANTED IN PART AND DENIED IN PART for the reasons set forth below.

**BACKGROUND**

On August 23, 2011, Plaintiff filed his Complaint against Defendants, asserting diversity jurisdiction.  [Complaint at ¶¶ 8-13.]  The Complaint arises from a structured business transaction, completed in April 2011 ("the Buyout"), in which 3D Systems purchased web domains and associated businesses ("the Web Businesses") owned by Plaintiff.  Plaintiff alleges that 3D Systems Chief Executive Officer Reichental and Chief Financial Officer Gregoire made promises to him regarding fixed-term employment with 3D Systems, and the commitment of substantial resources to the Web Businesses so Plaintiff could maximize royalties that he obtained in the Buyout.  Plaintiff further alleges that Defendants thereafter provided only minimal resources to the businesses, and terminated him in February 2013. [Id. at ¶¶ 14-103.]

The Complaint asserts the following causes of action: breach of contract against 3D Systems ("Count I"); breach of

---

[1](...continued)
of the purportedly confidential material, on January 7, 2015. [Dkt. no. 134.]

employment agreement against 3D Systems ("Count II"); breach of the covenant of good faith and fair dealing against 3D Systems ("Count III"); fraud against all Defendants ("Count IV"); negligent misrepresentation against all Defendants ("Count V"); unjust enrichment against 3D Systems ("Count VI"); and rescission against 3D Systems ("Count VII"). [Id. at ¶¶ 104-40.]

The Complaint seeks the following relief: damages; alternatively, rescission of various agreements between the parties and a return of the businesses; release of Plaintiff's shares of restricted common stock; punitive or exemplary damages; attorneys' fees and costs; and all other appropriate relief. [Id. at pgs. 29-30.]

On March 17, 2014, this Court issued its Order Denying Defendants' Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(2) or, in the Alternative, to Transfer Pursuant to 28 U.S.C. § 1404 ("3/17/14 Order").[2] [Dkt. no. 37.[3]] In the 3/17/14 Order, the Court, *inter alia*, agreed with Defendants that Count II was identical to a claim brought by Plaintiff against Defendants in a lawsuit related to the sale of his primary business, Print3D, and accepted Plaintiff's stipulation to

_____

[2] Defendants filed their Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(2) or, in the Alternative, to Transfer Pursuant to 28 U.S.C. § 1404 ("Motion to Dismiss") on October 21, 2013. [Dkt. no. 6.]

[3] The 3/17/14 Order is also available at 6 F. Supp. 3d 1068.

dismiss Count II without prejudice.  6 F. Supp. 3d at 1077

(discussing <u>Barranco v. 3D Sys. Corp. et al.</u>, CV 13-00411 LEK-RLP

("the Print3D Case")).[4]  On November 5, 2014, 3D Inc. filed its

Amended Counterclaims Against Plaintiff, asserting claims for

breach of contract related to Plaintiff's alleged failure to

convey all assets to 3D Systems after the Buyout ("Counterclaim

Count I"), breach of the non-compete agreement, which was also

part of the Buyout ("Counterclaim Count II"), and preliminary

injunction ("Counterclaim Count III").[5]  [Dkt. no. 118.]

Defendants filed the instant Motion on November 19,

2014.  [Dkt. no. 119.]  In the Motion, Defendants move for

summary judgment as to all claims against them.

## DISCUSSION

## I. Undisputed Facts

The following facts are undisputed.

Over the years, Plaintiff has started and owned several

businesses in the 3D printing industry.  On October 31, 1997,

Plaintiff created and registered the domain

_____

[4] In the Print3D Case, Plaintiff brought the same causes of
action against the same Defendants related to the sale of
Print3D, which occurred contemporaneously with the negotiations
and Buyout at issue in this case.  On February 28, 2014, this
Court ordered the Print3D Case transferred to the United States
District Court for the Western District of North Carolina.
<u>Barranco v. 3D Sys. Corp.</u>, Civil No. 13-00411 LEK-RLP, 2014 WL
806263, at *12 (D. Hawai`i Feb. 28, 2014).

[5] 3D Inc. initially filed its Counterclaims on August 18,
2014, but without the breach of contract claim.  [Dkt. no. 89.]

4

www.stereolithography.com ("SLAC") and, on February 13, 2004, he created and registered www.lasersintering.com ("LSCOM," collectively the "Primary Domains"). On February 17, 2011, Plaintiff met with 3D Systems at their headquarters in South Carolina to discuss selling Print3D, which he owned with Deelip Menezes ("Menezes"). In passing, Plaintiff discussed with 3D Systems the sale of the Primary Domains. On February 27, 2011 Plaintiff emailed Reichental with information regarding the Primary Domains, including sales figures ("February Figures"), which Plaintiff now admits were inaccurate. [Defs.' Concise Statement of Facts in Support of Defs.' Motion for Summary Judgment ("Defs.' CSOF"), filed 11/19/14 (dkt. no. 121), at ¶¶ 1-5; Pltf.'s Separate and Concise Statement of Facts in Opp. to Defs.' Motion for Summary Judgment on All Claims Against Them Filed on Nov. 19, 2014 [Doc #119] ("Pltf.'s CSOF"), filed 1/7/15 (dkt. no. 135), at ¶¶ 1-5.]

On February 28, 2011, Plaintiff, Menezes, Gregoire, and 3D Systems Assistant General Counsel Andrew Johnson, met in Los Angeles to discuss selling Print3D and the Primary Domains ("February Meeting"). Following the meeting, Johnson asked Plaintiff for financial data for the Primary Domains so 3D Systems could assess interest and, on March 8, 2011, Plaintiff emailed Johnson with certain financial "stats and books" for the Primary Domains ("March Figures"), which only included financial

statements from 2010 and 2011 year to date.  [Pltf.'s CSOF at
¶¶ 6, 9-10.]

On April 4 and April 5, 2011, Barranco and Menezes met
with Reichental, Gregoire and Johnson again in Los Angeles to
discuss Print3D, after which – without Menezes – they continued
discussion at a local restaurant, Joan's on Third ("Joan's"), to
discuss the Primary Domains sale ("April Meeting").  At Joan's,
Reichental took notes related to the structure of deal ("Notes"),
and then sometime later, Plaintiff signed a formal letter of
intent ("LOI").  [Id. at ¶¶ 12-14, 20.]

On April 15, 2011, Johnson sent Plaintiff a draft of a
Purchase and Sale Agreement ("PSA") for his review.  That same
day, 3D Systems' human resources division presented Plaintiff
with employment documents at their headquarters in South
Carolina, which he signed.  [Id. at ¶¶ 22-23; Pltf.'s CSOF, Decl.
of Ronald Barranco ("Barranco Decl.") at ¶ 7.]  One employment
document, which bears Plaintiff's signature, is titled,
**"AGREEMENT FOR AT-WILL EMPLOYMENT AND BINDING ARBITRATION"** ("the
Employment Agreement"), and states in its first sentence that it
"is not to be construed as a contract of employment, either for
an indefinite or fixed period of time."  Defs.' CSOF, Decl. of
Counsel ("Sugihara Decl."), Exh. B-82 (Employment Agreement)

(emphasis in original);[6] see also Pltf.'s CSOF at ¶ 24.[7]  On
April 18, 2011, Plaintiff and 3D Systems executed the PSA,
effective April 19, 2011, and 3D Systems paid Plaintiff $250,000
at closing.  [Pltf.'s CSOF at ¶ 26.]

        The central issues in the Motion (and in the lawsuit)
are: whether the PSA represented the complete agreement between
Plaintiff and 3D Systems, or whether Reichental and Gregoire made
additional promises, incorporated into the overall Buyout
agreement ("the Buyout Agreement"); what those promises were; and
whether the purported promises were made solely to induce
Plaintiff to enter into the PSA.  The Court concludes that: the
PSA is not fully-integrated; and genuine issues of material fact
remain as to whether promises were actually made and the content
of those promises; but Plaintiff has failed to raise a genuine
issue as to Defendants' intent in making the purported promises.

## II.  Contract Claims

        As an initial matter, in his memorandum in opposition
Plaintiff states that he will withdraw Count VII, for rescission
of the Buyout Agreement, because it is a remedy and not an

---

[6] Exhibit B to the Sugihara Declaration includes exhibits
from various depositions.

[7] While Plaintiff denies signing or agreeing to the
Employment Agreement, [Pltf.'s CSOF at ¶ 23,] he admits that the
document bears his signature.  [Pltf.'s CSOF, Decl. of Kamala S.
Haake ("Haake Decl."), Exh. 5 (Pltf.'s Excerpts of Trans. of
9/3/14 Depo. of Ronald Barranco ("Pltf.'s 9/3/14 Barranco
Depo.")) at 282-83.]

independent cause of action.  [Mem. in Opp. at 35.]  The Court

therefore DENIES the Motion as MOOT as to Plaintiff's rescission

claim, and DISMISSES WITH PREJUDICE Count VII.

### A.    Count I - Breach of Contract

Plaintiff alleges that 3D Systems breached: "the Letter

Agreement and the Web Domains PSA by failing and/or refusing to

provide substantial resources to the Web Domains' businesses

after it acquired the Web Domains[;]" and its promise to replace

the purported revenue stream of $150,000 generated by the

operator of SLAC prior to the Buyout, licensee Cranston Holdings

("Cranston").[8]  [Complaint at ¶¶ 105-06.]  Defendants argue that

3D Systems is entitled to summary judgment on Count I because the

PSA is an unambiguous, fully-integrated agreement with which the

purported extrinsic promises contradict.  [Mem. in Supp. of

Motion at 20-22; Reply at 1-7.]  This Court disagrees.

### 1.    Integration

---

[8] Plaintiff appears to set forth in his CSOF that 3D Systems also breached its promise to employ him for a fixed term of five years.  See Pltf.'s CSOF at ¶ 28.  However, since he did not allege it in the Complaint, nor does he argue it in his memorandum in opposition, the Court does not consider it.  See, e.g., Brass v. Cnty. of Los Angeles, 328 F.3d 1192, 1197 (9th Cir. 2003) (affirming district court's refusal to permit the plaintiff to raise arguments for the first time in his opposition to summary judgment).  Even if he had, any promise of fixed term employment was clearly superseded by the Employment Contract, as discussed more fully *infra* Section II.A.1.

This district court has explained:

> Pursuant to the parol evidence rule, "an agreement reduced to writing serves to integrate all prior agreements and negotiations concerning the transaction into the written instrument which then represents the final and complete agreement of the parties." State Farm Fire and Cas. Co. v. Pacific Rent-All, Inc., 978 P.2d 753, 762 (Haw. 1999). Accordingly, where an oral agreement is later reduced to writing, the prior oral agreement effectively becomes a nullity, in favor of the later written agreement.

> A prerequisite to the application of the parol evidence rule, however, is that "there must first be a finding by the trial court that the writing was intended to be the final and, therefore, integrated expression of the parties' agreement." Matter of O.W. Ltd. P'ship, 668 P.2d 56, 60 (Haw. App. 1983). A fully integrated agreement is one which, "in view of its completeness and specificity reasonably appears to be a complete agreement." Pancakes of Hawaii, Inc. v. Pomare Properties Corp., 944 P.2d 97, 108 (Haw. App. 1997); see also Restatement (Second) of Contracts § 209.

Honolulu Data Entry Project, Ltd. v. D. Bello Assocs., Civ. No. 12-000467 BMK, 2013 WL 6838276, at *6 (D. Hawai`i Dec. 26, 2013).

This district court has also explained that:

> Whether a contract is integrated is a question for the court, Restatement (Second) of Contract § 210(3), and the court may use all available evidence in reaching this determination.

> > That a writing was or was not adopted as a completely integrated agreement may be proved by any relevant evidence. A document in the form of a written contract, signed by both parties and apparently complete on its face, may be decisive of the issue in the absence of credible contrary evidence. But a writing cannot of itself prove its own completeness, and wide latitude must be allowed for inquiry

9

> into circumstances bearing on the intention
> of the parties.
>
> > Restatement (Second) of Contracts § 210 comment b;
> > see also United Public Workers, AFSCME, Local 646,
> > AFL-CIO v. Dawson Int'l, Inc., 113 Hawai`i 127,
> > 141, 149 P.3d 495, 509 (2006) (citing Restatement
> > (Second) of Contracts § 210 comment b); Pancakes,
> > 85 Hawai`i at 311, 944 P.2d at 108 ("[W]here the
> > parties reduce an agreement to a writing [that] in
> > view of its completeness and specificity
> > reasonably appears to be a complete agreement, it
> > is taken to be an integrated agreement unless it
> > is established by other evidence that the writing
> > did not constitute a final expression." (citing
> > Restatement (Second) of Contracts § 214 comment c
> > at 134 (1981))); Matter of O.W. Ltd. P'ship, 4
> > Haw. App. at 491, 668 P.2d at 60 ("All relevant
> > evidence bearing on the threshold question of
> > whether the agreement is an 'integrated' one is
> > admissible.") (citations omitted).

Seascape Dev. v. Fairway Capital, 737 F. Supp. 2d 1207, 1215-16

(D. Hawai`i 2010) (alterations in Seascape).

Defendants argue that the PSA is fully integrated

because it: includes merger language; [Reply at 2;] is specific

and appears complete from its four corners; [id. at 3;] and was

the "final step in the standard deal sequence," [Mem. in Supp. of

Motion at 21,] which shows the parties' intended it to be a

final, integrated agreement [Reply at 4-5].

### a.  **Merger Clause**

Regarding the first point, the PSA, executed by

Plaintiff and Gregoire on April 19, 2011, begins:

> For good and valuable consideration paid by
> 3D Systems, Inc. ("3D Systems") to Mr. Ron
> Barranco ("Mr. Barranco"), the receipt and
> sufficiency of which Mr. Barranco hereby desires

to see certain assets to 3D Systems and 3D Systems desires to purchase certain assets from Mr. Barranco, **on such terms and conditions as described in this Purchase and Sale Agreement** (the "Agreement").

[Sugihara Decl., Exh. D-9 (PSA) at 1 (emphasis added).[9]]

Defendants argue that the bold language is tantamount to a merger clause. [Mem. in Supp. of Motion at 21; Reply at 2.] As Plaintiff points out, Defendants knew how to draft a merger clause, since they included one in the Print3D Acquisition Agreement ("Print3D Agreement"), which was executed five days before the PSA. [Mem. in Opp. at 11.] The merger clause in the Print3D Agreement read:

> Merger Clause. This Agreement (including its Exhibits) and the Ancillary Agreements contain the final, complete and exclusive statement of the agreement between the parties with respect to the transactions contemplated by this Agreement and all prior or contemporaneous written or oral agreements with respect to the subject matter of this Agreement are merged herein and in the Ancillary Agreements.

[Haake Decl., Exh. 7 (Print3D Agreement), § 10(a) at RB000566.]

Similarly, the Employment Agreement, signed three days before the PSA, included clear merger language. The second paragraph of that agreement read:

> I also recognize that there are no other agreements, either expressed or implied, with regard to the at-will nature of this employment

---

[9] Exhibit D to the Sugihara Declaration includes selected exhibits to the 9/30/14 Deposition of Andrew Johnson ("Johnson Depo.").

> relationship.  This agreement constitutes the
> entire understanding between me and the Company
> with regard to the at-will nature of my employment
> relationship.  This agreement for at-will
> employment may not be modified, altered, amended,
> or changed except by an instrument in writing,
> signed by the Chief Executive Officer or the
> General Counsel of the Company.

[Employment Agreement at 1.]  Whether or not this language is an actual stand-alone merger clause, it was clearly intended to function as one.[10]  From the language of the PSA, in comparison to the Print3D Agreement and Employment Agreement, the Court concludes that the first paragraph of the PSA is not a merger clause.

## b.    **Completeness and Specificity of the PSA**

While Defendants are correct that the lack of a formal merger clause may not necessarily be dispositive of the issue, [Reply at 3,] it is informative in terms of the completeness and specificity of the PSA.  Viewing the PSA next to the Print3D Print3D Agreement and the Employment Agreement begs the question of why Defendants did not include a merger clause if they intended to create complete contract.

Regarding specificity, as Plaintiff's counsel argued at the hearing, the PSA is not nearly as detailed as Defendants contend.  [Mem. in Supp. of Motion at 22 ("'[I]n view of [the

_____

[10] Based on this merger language, even if Plaintiff had properly alleged and argued it, see *supra* n.8, any breach of contract claim based on a promise for a fixed five-year contract would fail as a matter of law.

PSA's] completeness and specificity,' it 'reasonably appears to be a complete agreement.'" (some alterations in original) (quoting Pancakes of Hawai`i, Inc., 85 Hawai`i at 311, 944 P.2d at 108)).]  The PSA is just over four pages, of which two pages relate to non-compete issues.  [PSA at 000049-51.]  Less than one page actually relates to the buyout, license fees, and royalties, that is, the actual terms of the purchase.  [Id. at 000048-49.]  In contrast, the Print3D Agreement is more than twenty-five pages, of which six pages relate to purchase price.  [Print3D Agreement, § 2 ("Purchase Price; No Assumption of Pre-Closing Liabilities; Etc.") at RB000545-50.]  Defendants argue that the terms of the Print3D Agreement do not "have any bearing on this Motion."  [Reply at 3-4 n.4.]  While that is true regarding the substance of the agreements, the Print3D Agreement shows that Defendants drafted and executed a complete, specific, and expressly integrated agreement just days before they signed the PSA.  Since it does not include a merger clause, and is neither clearly complete nor specific, the Court finds that the PSA is not fully-integrated from within its four corners.

### c.   <u>Intention of the Parties</u>

Finally, Defendants argue that, since the PSA came last in time, the parties intended it to fully incorporate all of the agreements that came before it.  In contrast, Plaintiff argues that the parties intended for the agreement to consist of the

13

Notes, LOI, and PSA, taken together.

Defendants' argument is unpersuasive as it would render merger clauses entirely unnecessary, so long as a formal contract came last in time during a negotiation. At the hearing, Defendants attempted to distinguish Seascape on this very basis, arguing that, unlike here, in that case there were contemporaneous documents, and the relationship between them was unclear. Defendants appear to concede that in such a situation it is proper to look outside of the four corners of the agreement.

The Court does not agree that the sequencing of the purported contract documents is determinative. In this case, there is a document, the Notes, that was undisputedly written in part by Reichental at the April Meeting, when the parties were negotiating the terms of the agreement. See Pltf.'s CSOF at ¶ 14. Central to this case is what exactly the Notes mean, and what relationship, if any, they have to the LOI and PSA. The Notes, which are handwritten on lined paper, read as follows:

| 1) web sites | $250K | 5% | buy out |
| 2) web dev | 50/50 split on Royalties & Fees | | |
| 3) comp | Base | $150k | $225 |
| | Bonus | $75k | |
| | Stock Grant | 5000 | -$250k |
| | | | $300k |

[Sugihara Decl., Exh. D-4.] This entire section has a box around it, underneath which are the terms "LOI," "+ 100 defensive

14

domains," and "- look at right of first refusal."[11]  [Id.]  From
the parties' arguments, it appears undisputed that the content of
the Notes was to be included in some way in the Buyout Agreement,
in particular, because the Notes include the term "LOI" and the
50/50 royalty structure from the second line was later included
in the formal LOI and the PSA.  [Sugihara Decl, Exh. D-8 (LOI) at
000044; PSA at 000048.]

There is some dispute, however, what exactly was
intended by including "LOI" in the Notes and whether, by
implication, other terms were to be incorporated from the Notes
into the LOI and/or PSA.[12]  Plaintiff testified that Reichental

_____

[11] These terms are circled and numbered in Exhibit D-4.
However, it appears that Johnson circled and numbered them at his
deposition, and thus the Notes themselves did not include the
circling and numbering.  Compare Exh. D-4; with Mem. in Opp. at
13 (photograph of Notes); see also Sugihara Decl., Exh. C (Defs.'
Excerpts of Trans. of Johnson Depo. ("Defs.' Johnson Depo.")) at
118 ("Q.  Why don't you circle and then number 1 for that.  A.
Number 1 is where 'LOI' is written under the box.  The second is
what refers to as 'plus 100 defensive domains.'  And the third is
a final statement that says 'look at right of first refusal.'").

[12] Plaintiff argues that the Notes guarantee him $5 million
from the Buyout, plus $1 million in compensation.  [Mem. in Opp.
at 12-14.]  He reaches that figure because he interprets the
first line to mean that the $250,000 cash at closing, which he
did receive, would be 5% of the total buyout.  The 50/50 royalty
structure from the second line was the mechanism to get to the $5
million total.  The compensation plan in the third line added an
additional $1 million comprised of a yearly base salary of
$150,000 plus $75,000 bonus for five years, and stock.
Defendants contend that the first line was meant to convey that
Plaintiff would receive a 5% royalty for payments from third
parties regarding the Primary Domains, but that Plaintiff would
have the option of buying out that portion of the agreement if he
(continued...)

15

wrote the figures within the box, and then wrote "LOI" and put the square around the box to signify that the Notes itself was to be a letter of intent. [Haake Decl., Exh. 4 (Pltf.'s Excerpts of Trans. of 9/2/14 Depo. of Ronald Barranco ("Pltf.'s 9/2/14 Barranco Depo.")) at 34-37, 84-86.] Defendant offers contrary evidence that, while Reichental wrote the deal terms, Johnson wrote "LOI" and the other two items below the box to signify that he would draft a formal LOI as the next step in the negotiation process, which he did shortly thereafter. [Defs.' 9/30/14 Johnson Depo. at 32, 46-47, 118; Sugihara Decl., Exh. E (Defs.' Excerpts of Trans. of 10/1/14 Depo. of Abraham N. Reichental ("Defs.' Reichental Depo.")) at 123.] Viewing the evidence in the light most favorable to Plaintiff, including Defendants' decision not to include a merger clause in the PSA, there exists a genuine issue of material fact as to whether the parties intended the PSA to be fully integrated. See Grenning v. Miller-Stout, 739 F.3d 1235, 1238 (9th Cir. 2014) ("Summary judgment is appropriate when, with the evidence viewed in the light most favorable to the non-moving party, there are no genuine issues of material fact, so that the moving party is entitled to a judgment as a matter of law." (citation and

---

[12](...continued)
so desired. Under this explanation, there is no promise whatsoever of $5 million. (Defendants argue that the $1 million is precluded by the 3/17/14 Order.)

16

internal quotation marks omitted)).

### d. Conclusion

Since there is no merger clause in the PSA, the PSA is neither complete nor specific, and Defendants have not set forth evidence sufficient to show that the parties intended the PSA to be integrated, the Court concludes as a matter of law that the PSA is not a fully-integrated document.  See Seascape, 737 F. Supp. 2d at 1215 ("[w]hether a contract is integrated is a question for the court").  Further, the Court notes that it is undisputed that Defendants drafted the PSA, and "contracts are construed against the drafter."  Kutkowski v. Princeville Prince Golf Course, LLC, 129 Hawai`i 350, 360 n.9, 300 P.3d 1009, 1019 n.9 (2013).  Thus, since the PSA is not fully-integrated, the Court may look to extrinsic evidence to determine the complete terms of the Buyout Agreement.

### 2. Ambiguity

Just as Defendants argue that the PSA is fully integrated, they also argue that it is unambiguous, and thus the Court may not look to extrinsic evidence to analyze the Buyout Agreement.  [Reply at 5.]  Specifically, they contend that "'[p]arol evidence is inadmissible to explain . . . the plain meaning of the [PSA]'"  [Id. (alterations in reply) (quoting Davis v. Mills, 21 Haw. 167, at *1 (Haw. Terr. 1912)).]  Defendants read the ambiguity rule too narrowly.

The Hawai`i Supreme Court has described the standards
for interpreting the substance of a contract:

>    Contract terms are interpreted according to
>    their plain, ordinary, and accepted sense in
>    common speech.  Cho Mark Oriental Food v. K & K
>    Intern., 73 Haw. 509, 520, 836 P.2d 1057, 1064
>    (1992).  **The court's objective is "to ascertain
>    and effectuate the intention of the parties as
>    manifested by the contract in its entirety."** Brown
>    [v. KFC Nat'l Mgmt. Co], 82 Hawai`i [226,] 240,
>    921 P.2d [146,] 160 [(1996)] (citation and
>    internal quotation marks omitted).
>
>    A contract is ambiguous when its terms are
>    reasonably susceptible to more than one meaning.
>    Airgo v. Horizon Cargo Transp., 66 Haw. 590, 594,
>    670 P.2d 1277, 1280 (1983).  As a general rule,
>    the court will look no further than the four
>    corners of the contract to determine whether an
>    ambiguity exists.  State Farm Fire & Cas. Co. v.
>    Pac. Rent-All, 90 Hawai`i 315, 324, 978 P.2d 753,
>    762 (1999) (noting that the parties' disagreement
>    as to the meaning of a contract does not render it
>    ambiguous).  The parol evidence rule "precludes
>    the use of extrinsic evidence to vary or
>    contradict the terms of an unambiguous **and**
>    integrated contract." Pancakes of Hawai`i v.
>    Pomare Props. Corp., 85 Hawai`i 300, 310, 944 P.2d
>    97, 107 (App. 1997) (citation omitted).  This
>    rule, however, is subject to exceptions that
>    permit the court to consider extrinsic evidence
>    when the writing in question is ambiguous **or**
>    incomplete.  Id.  Where there is any doubt or
>    controversy as to the meaning of the language, the
>    court is permitted to consider parol evidence to
>    explain the intent of the parties and the
>    circumstances under which the agreement was
>    executed.  Hokama v. Relinc Corp., 57 Haw. 470,
>    476, 559 P.2d 279, 283 (1977).  The court may
>    admit parol evidence to explain an ambiguity,
>    whether latent or patent:
>
> >    In determining whether or not an ambiguity
> >    exists in a document, under the parol
> >    evidence rule, **the test lies not necessarily
> >    in the presence of particular ambiguous words**

> **or phrases but rather in the purport of the
> document itself, whether or not particular
> words or phrases in themselves be uncertain
> or doubtful in meaning.** In other words, a
> document may still be ambiguous although it
> contains no words or phrases ambiguous in
> themselves. The ambiguity in the document
> may arise solely from the unusual use therein
> of otherwise unambiguous words or phrases.
> An ambiguity may arise from words plain in
> themselves but uncertain when applied to the
> subject matter of the instrument. In short,
> such an ambiguity arises from the use of such
> words of doubtful or uncertain meaning or
> application.

> Hokama, 57 Haw. at 474-75, 559 P.2d at 282
> (citations omitted) (emphasis added).

Hawaiian Ass'n of Seventh-Day Adventists v. Wong, 130 Hawai`i 36,

45-46, 305 P.3d 452, 461-62 (2013) (some alterations in Wong)

(emphases added). Under the parol evidence rule, specifically

the statements in bold above, if the Court finds that the

contract is **either** ambiguous **or** incomplete, then it may look to

parol evidence in interpreting the intentions of the parties.[13]

Here, the Court has found that the PSA is not fully-integrated,

so it is proper to look to extrinsic evidence.

---

[13] In fact, some Hawai`i courts have dispensed with the
ambiguity inquiry where there was no integration clause. See
Hawaii Leasing v. Klein, 4 Hawai`i App. 1, 8, 658 P.2d 343, 348
(Ct. App. 1983) ("Although [the lease] is unambiguous, unlike the
lease in Transamerican Leasing [Co. v. Three Bears, Inc., 586
S.W.2d 472 (Tex. 1979)], it contains no integration clause.
Thus, the 'whole agreement' rule of Akamine & Sons [v. American
Security Bank, 50 Haw. 304, 440 P.2d 262 (1968)], would not
preclude extrinsic evidence of a collateral agreement between the
parties.").

Plaintiff argues that Defendants made oral promises, as reflected in the Notes, and thus those promises were integrated into the agreement. The question then is whether those purported promises "vary or contradict" the other terms of the agreement, namely the PSA. See Pancakes of Hawai`i, 85 Hawai`i at 310, 944 P.2d at 107.

### 3. Consistency with the PSA

The crux of Defendants' argument is that the specific sums that Plaintiff argues that Defendants promised him ($6 million total Buyout and $150,000 for the Cranston revenue stream) "contradict" the royalty structure formulas, which are variable by definition. [Reply at 6.] Plaintiff, however, argues that nothing in the PSA actually conflicts with a collateral promise that Plaintiff would receive **at least** a certain amount. [Mem. in Opp. at 12-18.] The Court finds that, whether or not Defendants promised Plaintiff sums certain, genuine issues of material fact remain regarding the alleged promises to fund the Web Businesses sufficient to warrant the denial of summary judgment as to Count I.

First, although Plaintiff argues that the Notes guaranteed him $5 million for the Buyout, the Complaint alleges that 3D Systems breached the Buyout Agreement, not by failing to pay him $5 million, but rather by failing to provide substantial resources to the Web Businesses. So the promise at issue in the

20

Complaint then is to invest in the Primary Domains, not to guarantee Plaintiff $5 million in the Buyout. <u>See</u> Complaint at ¶ 105; <u>see also</u> Defs.' CSOF at ¶ 28. The question then is whether there is a genuine issue of material fact as to whether that substantial investment promise was made, and whether that promise contradicts the terms of the PSA.

Defendants argue that they never promised to invest in the Primary Domains after the Buyout. [Mem. in Supp. of Motion at 16-18.] Plaintiff presents the following evidence that they did:

- At the February Meeting, Gregoire represented to Plaintiff that when 3D Systems acquires a company it: integrates the new company so its "comfortable" within the larger organization; and makes "commitments to invest, both in marketing and resources[.]"[14] [Feb. Meeting Trans. at 32-

---

[14] Plaintiff secretly recorded the February Meeting and had the recording transcribed. Specifically, Gregoire stated:

> [W]e have another, couple other ones with little smaller amounts and things, too, is we made certain commitments to invest at that same point in time. . . . So we can make those commitments to invest, both in marketing and . . . resources and everything there too." [Sugihara Decl., Exh. 6 (Trans. of Recording Z0000006 of Meeting at Hotel, Hollywood, CA ("Feb. Meeting Trans.")) at 32-33.]

> [W]ith all of these shops, like once we've done, we've upgraded equipment, we've upgraded capacity, we've upgraded, you know, their abilities . . . . [W]e'll continue to make these investments, so. So, it's not like we just said, "Let's buy this one and then move on to the next and the next." We moved on to the next and the
> (continued...)

33, 112.]

- At the same meeting, Gregoire stated that, with the acquisition, 3D Systems "could really push this whole thing, your whole thing, that would be our whole thing to the whole, not the next level, but the next three levels." [Id. at 113.]

- Plaintiff testified that, at the April Meeting, Reichental told him that, "he would operate [the Web Businesses] to its fullest extent with all full marketing, full personnel/salespeople, complete management of the system." Pltf.'s 9/2/14 Barranco Depo. at 21-22; see also id. at 57-58 (testifying that Reichental made the promise at Joan's).

- Plaintiff further testified that Reichental promised him $6 million at the April Meeting, and explained how the terms in the Notes would get him to that remuneration. [Id. at 34-38 (interpreting the Notes and describing the conversation).]

    Notably, Defendants do not offer any evidence to show that they did not promise to commit substantial resources to the Web Businesses.[15]  Instead, they deny guaranteeing Plaintiff the $5 million,[16] and argue that, since Plaintiff misrepresented the

---

[14](...continued)
    next while we continue to invest in the existing. [Id. at 34.]

    Here's the new process for it. . . .  I think we do a good job drawing upon all the areas.  And there's not a lot of turf wars when it comes to sharing the technology and everything, because everybody's so comfortable[.]  [Id. at 112.]

[15] Defendants in one place appear to deny the promise. [Reply at 2.]  However, they simply make a conclusory statement, without citing any evidence.  [Id.]

[16] For example, Defendants offer Reichental's testimony denying any guarantee, but admitting that what he said was that, "if all [Plaintiff's] numbers and projections are correct he could potentially get to that level."  [Defs.' Reichental Depo.
                                                    (continued...)

actual financial health of the Primary Domains, any promise of either $6 million for the Buyout or $150,000 for SLAC should be disregarded because those promises would have been based on misstatements. [Mem. in Supp. of Motion at 26-27, 33-35.] While it is true that there were at least some misrepresentations in the February and March Figures, it does not negate Plaintiff's evidence that Defendants committed to funding the Primary Domains and the Web Businesses. Viewing the evidence set forth above, including the Notes, in the light most favorable to Plaintiff, there is a genuine issue of material fact as to whether Defendants promised to invest substantial resources in the Web Businesses after the Buyout.

Finally, such a promise in no way contradicts the royalty formulas in the PSA.[17] Therefore, there is a genuine issue of material fact as to whether the Buyout Agreement included a promise by Defendants to invest in the Primary Domains and Web Businesses. Although there remain disputed questions of fact as to whether Defendants did in fact promise to invest and, if so how much, and whether they invested to the promised point,

---

[16](...continued)
at 140.] This testimony actually supports Plaintiff's argument that Defendants promised to invest substantially in the Primary Domains, even if it tends to prove they did not guarantee the $6 million or intend it to be incorporated into the PSA.

[17] In fact, as Plaintiff argues, a promise to invest goes hand in hand with a royalty formula. Otherwise, the formula alone would yield Plaintiff nothing.

Plaintiff has provided sufficient evidence to avoid summary judgment on these points.

On the other hand, the only evidence Plaintiff offers that Defendants promised to replace the Cranston revenue stream with at least $150,000 is a single statement from his own deposition. Specifically, Plaintiff testified that Reichental, "promised me this $150,000 plus in royalty payments" at Joan's. [Pltf.'s 9/2/14 Barranco Depo. at 43-44.] "[C]onclusory allegations, unsupported by facts, are insufficient to survive a motion for summary judgment." Hernandez v. Spacelabs Med. Inc., 343 F.3d 1107, 1116 (9th Cir. 2003). In light of the paucity of evidence, the Court finds that Plaintiff has failed to raise a genuine issue of material fact as to a specific actionable guarantee of $150,000.

However, there is a genuine issue of fact as to whether Defendants promised to fund SLAC at the same level as before the Buyout, whatever that actual level was. Plaintiff testified that Reichental:

> made the promise in one of those three meetings that I wasn't to worry about the income stream, this revenue that was coming through Stereolithography.com, because 3D Systems would replace that revenue stream and they would – and it would likely surpass that because 3D Systems has all of the personnel, all of the management, all of the marketing, all the contacts, all the resources that – that neither myself or even Cranston had to take this domain to its full potential.

[Pltf.'s 9/2/14 Barranco Depo. at 43.]  Along with the evidence

described above, regarding Defendants' purported commitment to

invest in the Web Businesses, this creates a genuine issue of

material fact as to whether Defendants committed to continue

funding SLAC at the same level, and whether in fact they breached

that promise.  Since such a promise is not inconsistent with the

PSA, it survives summary judgment.

     In sum, the Court DENIES summary judgment insofar as

genuine issues of material fact remain regarding whether

Defendants promised to invest substantial resources in the Web

Businesses, including replacing the SLAC revenue stream, and

whether Defendants breached that promise.  The Court GRANTS

summary judgment insofar as there is no genuine issue of fact as

to the specific promise that Defendants would ensure that SLAC

would generate $150,000 or more of annual revenue.  See Fed. R.

Civ. P 56(a) ("The court shall grant summary judgment if the

movant shows that there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of

law.").

     The Court also DENIES summary judgment on Count VI, for

unjust enrichment.  Defendants argue that there is a remedy at

law for the purportedly breached promises because the PSA covers

the same subject matter.  [Reply at 18.]  Since there is still an

active dispute over whether the promises were made and their

content, at this juncture it is not clear whether there is a viable remedy at law.  See Uyeshiro v. Irongate Azrep BW LLC, Civ. No. 13-00043 ACK-BMK, 2014 WL 414219, at *9 (D. Hawai`i Feb. 3, 2014) (denying dismissal of unjust enrichment claim, where it was unclear whether there had been "mutual assent to all of the essential terms of the contract").  The Court therefore DENIES the Motion as to Count VI.

## B.  Count III - Breach of the Covenant of Good Faith

Defendants' argument, regarding Count III, relies entirely on the presumption that they have not breached the Buyout Agreement.  Since this Court has not reached that conclusion, summary judgment at this juncture is not warranted. Furthermore, even if the Court was to find that the PSA was fully-integrated, and there was no term requiring Defendants to invest in the Primary Domains to a set point, there would still be a triable issue of fact as to Count III.

This district court has explained:

> The obligation to deal in good faith is a well-established principle in Hawaii contract law. See Best Place[, Inc. v. Penn Am. Ins. Co.], 82 Hawai`i [120,] 124, 920 P.2d [334,] 338 [(1996)] (citing Restatement (Second) of Contracts § 205 (1979) ("Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement.")).  The Intermediate Court of Appeals for the State of Hawaii has expressly noted that parties have a duty of good faith and fair dealing in performing contractual obligations; such good faith "emphasizes faithfulness to an agreed common purpose and consistency with the justified

expectations of the other party." <u>Hawaii Leasing</u>
<u>v. Klein</u>, 5 Haw. App. 450, 456, 698 P.2d 309, 313
(App. 1985) (citing Restatement (Second) of
Contracts § 205, cmt. a). "Thus, a party who
evades the spirit of the contract, willfully
renders imperfect performance, or interferes with
performance by the other party, may be liable for
breach of the implied covenant of good faith and
fair dealing." 23 Williston on Contracts § 63:22
(4th ed.) (quotation marks, alterations, and
citation omitted); <u>see also</u> Restatement (Second)
of Contracts § 205, cmt d ("A complete catalogue
of types of bad faith is impossible, but the
following types are among those which have been
recognized in judicial decisions: evasion of the
spirit of the bargain, lack of diligence and
slacking off, willful rendering of imperfect
performance, abuse of a power to specify terms,
and interference with or failure to cooperate in
the other party's performance.").

<u>Illinois Nat'l Ins. Co. v. Nordic PCL Constr., Inc.</u>, Civil No.

11-00515 SOM/KSC, 2013 WL 5739639, at *5 (D. Hawai`i Oct. 22,

2013). Plaintiff contends that Reichental and Gregoire promised

to invest substantial resources in the Web Businesses. Even if

this was not expressly incorporated into the PSA, Plaintiff could

still prove that investment in the Web Businesses was "an agreed

common purpose" and winding down the Primary Domains was an

"evasion of the spirit of the bargain," or "slacking off." The

Court therefore DENIES summary judgment as to Count III.

**III. <u>Fraud Claims</u>**

**A. <u>Count IV - Fraud</u>**

Plaintiff alleges that Defendants made three actionable

promises, that they would: (1) employ Plaintiff for five years;

(2) generate more than $150,000 in replacement income from the

27

Cranston license; and (3) commit substantial resources such that Plaintiff would make $6 million total from the Buyout.  Complaint at ¶ 119; see also Pltf.'s CSOF at ¶ 29.

The Hawai`i Supreme Court has explained:

> A plaintiff alleging fraud must establish the following elements:
>
> > (1) false representations were made by defendants, (2) with knowledge of their falsity (or without knowledge of their truth or falsity), (3) in contemplation of plaintiff's reliance upon these false representations, and (4) plaintiff did rely upon them.
>
> Shoppe v. Gucci Am., Inc., 94 Hawai`i 368, 386, 14 P.3d 1049, 1067 (2000) (emphasis added) (internal quotation marks and citations omitted).  The false representation must concern a "past or existing material fact" but cannot be based on promises or "statements which are promissory in their nature." Id.

Cvitanovich-Dubie v. Dubie, 125 Hawai`i 128, 160, 254 P.3d 439, 471 (2011).  "A promise relating to future action or conduct will be actionable, however, if the promise was made without the present intent to fulfill the promise."  Hawaii Cmty. Fed. Credit Union v. Keka, 94 Hawai`i 213, 230, 11 P.3d 1, 18 (2000) (citations, internal quotation marks, and brackets omitted).

As an initial matter, Shoppe, 94 Hawai`i at 386-87, 14 P.3d at 1067-68, forecloses Plaintiff's employment claim, and Plaintiff does not argue to the contrary.  In that case, the plaintiff, a Gucci store manager appealing a grant of summary judgment on her fraud claim, argued that she had "presented

28

'evidence of a **promise** of job security.'" Id. at 368, 14 P.3d at
1067 (emphasis in Shoppe). The Court did not look beyond her
employment contract that, like the Employment Agreement in the
instant case, clearly specified it was "at will." The court
explained:

> At the time Plaintiff was hired, Defendants
> offered her present employment, which was
> fulfilled. The record does not indicate that
> Plaintiff was to be employed with Gucci for a
> definite time period. In fact, the terms of
> Plaintiff's employment were clearly "at-will."
> Therefore, it is undisputed that Defendants did
> not make any false statements of material fact.
> Accordingly, the circuit court correctly granted
> summary judgment in favor of Defendants.

Id. at 387, 14 P.3d at 1068. Following the reasoning in Shoppe,
this Court GRANTS summary judgment on Count IV as to the alleged
employment-related representation.

Defendants argue that summary judgment on the fraud
claims arising from the purported promises to pay $6 million and
replace the $150,000 Cranston license is warranted because:
(1) the promises are unactionable predictions, which were neither
within Defendants' exclusive control nor required specialized
knowledge; (2) any reliance by Plaintiff on the promises was
unreasonable; and (3) Plaintiff has put forth insufficient
evidence that Defendants did not intend to fulfill the purported
promises. [Reply at 9-18.] The crux of Plaintiff's fraud claim
is that Defendants lured him into the Buyout Agreement by
promising to invest heavily in the Web Businesses, when they

intended all along to use the Primary Domains to siphon off
business, which would result in a small payout for Plaintiff.
[Mem. in Opp. at 22-24.]  Thus, since this Court has already
concluded that there are genuine issues of material fact as to
whether Defendants made the promise – to invest substantial
resources in the Web Businesses, including replacing the Cranston
license revenue stream – the issue boils down to Defendants' last
argument, whether Plaintiff has offered sufficient evidence as to
Defendants' intentions.[18]

Plaintiff argues that "[t]here is a plethora of
evidence tending to show that Defendants did not intend to
fulfill their promises to Plaintiff."  [Mem. in Opp. at 19.]
However, he only offers the following evidence:

- Purported admissions by Gregoire that he never intended to
    invest resources in Print3D, and that the Primary Domains
    were simply a "revenue stream."  [Mem. in Opp. at 22-23.]

---

[18] The Court also specifically rejects Defendants' other
arguments.  First, although Defendants may not, strictly
speaking, have exclusive control over the entire royalty stream
because some revenue will come from third parties, see Reply at
10-11, Defendants do have control over whether and how much to
promote the Primary Domains, and thus Illinois Nat. Ins., 2013 WL
5739639, at *10, is not to the contrary.  Second, whether or not
the Buyout Agreement required "specialized" knowledge, see Reply
at 12-13, a genuine dispute exists as to whether Defendants were
in a far superior bargaining position since Plaintiff has put
forth evidence that they were.  [Mem. in Opp. at 27-28
(summarizing evidence).]  Third, due to the prior two points, in
particular, that Plaintiff has offered evidence that he was given
assurances by Reichental that Defendants would invest in the Web
Businesses, there is a genuine issue as to whether Plaintiff's
reliance was reasonable.

- Deposition testimony by Gregoire and Johnson that they were
     unsure of who was responsible for marketing the Primary
     Domains.  [Id. at 23.]

- Evidence regarding "after-the-fact" behavior, such as: a
     decrease in SLAC sales; customer service and pricing
     problems related to the Primary Domains; "potential
     funneling of sales" from SLAC to 3D Systems' other
     businesses; and a decrease of investment in the Primary
     Domains.  [Id. at 23-24.]

However, even taken together, this evidence does not show a lack of intent by Defendants of investing in the Web Businesses at the time they negotiated the Buyout.  First, as Defendants emphasize, [Reply at 16,] Plaintiff misstates the Gregoire testimony.  In the cited testimony, Gregoire did not concede that 3D Systems intended to stop investing in the Web Businesses (or Print3D, for that matter).  See Haake Decl., Exh. 3 (Pltf.'s Excerpts of Trans. of 10/2/14 Depo. of Damon Gregoire ("Pltf.'s Gregoire Depo.")) at 86-88.  Nor does his reference to the Primary Domains as a "revenue stream" tend to show anything about Defendants' plans for the Primary Domains.  See id. at 101-02.

Second, Johnson's and Gregoire's testimony – that they were not, at the time of their depositions, aware of who handled the marketing for the Primary Domains – in no way proves their intentions at the time of the Buyout.  See id. at 131-32; Haake Decl., Exh. 1 (Pltf.'s Excerpts of Trans. of Johnson Depo. ("Pltf.'s Johnson Depo.")) at 138-39.

Third, as Defendants argue, the post-acquisition problems with the Primary Domain businesses do not prove intent. [Id. at 16-17 (quoting Honolulu Fed. Sav. & Loan Ass'n v. Murphy, 7 Haw. App. 196, 203, 753 P.2d 807, 812 (1988)).]

As the Hawai`i Intermediate Court of Appeals in Murphy explained:

> At best, the evidence may support a claim for breach of contract, but not for fraud. As stated in a treatise on torts:
>
>> Unless the present state of mind is misstated, there is of course no misrepresentation. When a promise is made in good faith, with the expectation of carrying it out, the fact that it subsequently is broken gives rise to no cause of action, either for deceit, or for equitable relief. Otherwise any breach of contract would call for such remedy. The mere breach of a promise is never enough in itself to establish the fraudulent intent.

7 Haw. App. at 203, 753 P.2d at 812-13 (some citations omitted) (quoting W. Keeton, Prosser and Keeton on the Law of Torts § 109 at 764 (5th ed. 1984) (footnotes omitted)).

Plaintiff does provide two emails, dated July 3, 2012 and August 27, 2013, respectively, that may show some siphoning of business. [Haake Decl., Exhs. 16, 17.] However, in light of a complete dearth of, for instance, contemporaneous documents from the time of the Buyout negotiations or any real admission that tends to show a lack of intent to fulfill the promises, this Court cannot say that Plaintiffs have raised a genuine issue of

material fact.  For this reason, the Court GRANTS summary

judgment for Defendants on Count IV.

      **B.**    **<u>Count V - Negligent Misrepresentation</u>**

         Plaintiff's negligent misrepresentation claim is based

on the same purported promises as his fraud claim.  Complaint at

¶ 128; <u>see also</u> Pltf.'s CSOF at ¶ 29.

         The Hawai`i Supreme Court has held: "Negligent

misrepresentation requires that: (1) false information be

supplied as a result of the failure to exercise reasonable care

or competence in communicating the information; (2) the person

for whose benefit the information is supplied suffered the loss;

and (3) the recipient relies upon the misrepresentation."  <u>Ass'n</u>

<u>of Apartment Owners of Newtown Meadows ex rel. its Bd. of Dirs.</u>

<u>v. Venture 15, Inc.</u>, 115 Hawai`i 232, 263, 167 P.3d 225, 256

(2007) (emphasis and citations omitted).  This district court has

predicted that "it is likely that the Hawaii Supreme Court would

also recognize a negligent misrepresentation claim based on a

speaker's present intention to do or not do something in the

future."  <u>Illinois Nat'l Ins.</u>, 2013 WL 5739639, at *11.

         Since Plaintiff has not raised a genuine issue of

material fact as to Defendants' intent or that the information

contained in the purported promises was false, <u>see</u> <u>Newtown</u>

<u>Meadows</u>, 115 Hawai`i at 263, 167 P.3d at 256, Plaintiff's

negligent misrepresentation claim fails for the same reasons as

his fraud claim.  The Court therefore GRANTS summary judgment for Defendants on Count V.

## CONCLUSION

On the basis of the foregoing, Defendant's Motion for Summary Judgment on All Claims Against Them, filed November 19, 2014, is HEREBY GRANTED IN PART AND DENIED IN PART.

Summary judgment is GRANTED for Defendants as to Counts IV, and V in their entirety.  Summary judgment is also GRANTED as to Counts I and III, but only insofar as those claims arise from: a promise superseded by the Employment Agreement; or the alleged promise to provide Plaintiff more than $150,000 in remuneration as replacement for the Cranston revenue stream.

The Motion is DENIED as to Counts I, III and VI.  It is DENIED AS MOOT as to Count VII, which is HEREBY DISMISSED WITH PREJUDICE.  There being no remaining claims against Defendants Reichental and Gregoire, the Court DIRECTS the Clerk's Office to terminate them as parties.

IT IS SO ORDERED.

DATED AT HONOLULU, HAWAII,



/s/ Leslie E. Kobayashi
Leslie E. Kobayashi
United States District Judge

**RONALD BARRANCO VS. 3D SYSTEMS CORPORATION, ET AL; CIVIL 13-00412 LEK-RLP; ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON ALL CLAIMS AGAINST THEM**