IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| RONALD BARRANCO, | ) | CIVIL NO. 13-00412 LEK-RLP |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| 3D SYSTEMS CORPORATION, a | ) | |
| Delaware corporation, 3D | ) | |
| SYSTEMS, INC., a California | ) | |
| corporation, ABRAHAM | ) | |
| REICHENTAL, DAMON GREGOIRE, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW AND ORDER

Following a jury trial, this matter came on for a one-day bench trial on the issue of equitable accounting on November 20, 2017.  Plaintiff/Counterclaim Defendant Ronald Barranco ("Plaintiff" or "Barranco") was represented by Mark Poe, Esq., and Patrick Shea, Esq.  Defendants/Counterclaimants 3D Systems Corporation and 3D Systems, Inc. ("Defendants" or "3D Systems"), were represented by Thomas Benedict, Esq., Dawn T. Sugihara, Esq., and Nikole Setzler Mergo, Esq.  The Court, having considered the declarations and evidence admitted into evidence, the testimony at trial, and the arguments of counsel, makes the following Findings of Fact and Conclusions of Law and Decision pursuant to Fed. R. Civ. P. 52.  Any finding of fact that should more properly be deemed a conclusion of law and any conclusion of

law that should more properly be deemed a finding of fact shall
be so construed.

## BACKGROUND

Plaintiff originally filed his Complaint on August 23,
2013, asserting diversity jurisdiction pursuant to 28 U.S.C.
§ 1332 and venue pursuant to 28 U.S.C. § 1391(b). [Dkt. no. 1.]
Plaintiff alleged claims against 3D Systems for breach of
contract ("Count I"), breach of employment agreement
("Count II"), breach of the implied covenant of good faith and
fair dealing ("Count III"), fraud ("Count IV"), negligent
misrepresentation ("Count V"), unjust enrichment ("Count VI"),
and rescission ("Count VII"). Plaintiff's claims arose from a
Purchase and Sale Agreement ("PSA") regarding certain web
domains.[1] [Id.]

On August 19, 2014, Defendants filed counterclaims, and
on September 8, 2014, filed amended counterclaims. [Dkt.
nos. 89, 101.] On November 5, 2014, Defendants filed their
Amended Counterclaims Against Plaintiff ("Second Amended
Counterclaims"). [Dkt. no. 118.] In the PSA, Barranco agreed
not to compete with 3D Systems for a five-year period ("Non-
Compete Provision"). [PSA at § 6.] Defendants' Second Amended
Counterclaims alleged breach of contract for violation of the

---

[1] A copy of the PSA was received in evidence. [Decl. of
Andrew M. Johnson ("Johnson Decl."), filed 11/17/17 (dkt. no.
374), Exh. 1 ("PSA").]

Non-Compete ("Non-Compete Counterclaim") and for failure to completely convey all of the assets purchased under the PSA ("Failure to Convey Counterclaim").

On March 17, 2014, Plaintiff's Count II was dismissed. [Order Denying Defs.' Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(2) or, in the Alternative, to Transfer Pursuant to 28 U.S.C. § 1404 ("3/17/14 Order"), dkt. no. 37.[2]] On January 30, 2015, Counts IV, V, and VII were dismissed. Plaintiff's remaining claims were Counts I, III, and VI. [Order Granting in Part and Denying in Part Defs.' Motion for Summary Judgment on All Claims Against Them ("1/30/15 Order"), dkt. no. 140.[3]]

On May 17, 2016, a jury trial commenced. [Minutes, dkt. no. 250.] On May 26, 2016, the case went to the jury. [Minutes, dkt. no. 278.] On May 27, 2016, the jury reached a verdict in favor of Defendants on all claims brought by Plaintiff. [Special Verdict Form, dkt. no. 282.] The jury found for Defendants on their Non-Compete Counterclaim against Plaintiff. [Id.] Specifically, the jury answered "yes" to the following question: "Did Barranco breach his promise not to engage in competition with 3D Systems for five years after signing the PSA?" [Id. at 6.] The jury also found 3D Systems

---

[2] The 3/17/14 Order is available at 6 F. Supp. 3d 1068.

[3] The 1/30/15 Order is available at 2015 WL 419687.

did not "promise to invest substantial resources into the Primary Domains."[4]  [Id. at 2.]

Plaintiff was granted judgment as a matter of law on the Failure to Convey Counterclaim after Defendants conceded they had not offered sufficient evidence of actual damages. [EO: Court Ruling Regarding the Remaining Issues in this Case, filed 6/22/16 (dkt. no. 287) ("6/22/16 EO Ruling").]  On May 9, 2017, this Court denied Plaintiff's oral motion for judgment as a matter of law on Defendants' Non-Compete Counterclaim. [Order Denying Pltf.'s Oral Motion for Judgment as a Matter of Law ("5/9/17 Order"), dkt. no. 300.[5]]  The 5/9/17 Order concluded the jury's verdict was supported by evidence showing Barranco violated the Non-Compete Provision.  2017 WL 1900970, at *4. Under its terms, Barranco could breach the Non-Compete Provision by developing a competing product, or assisting another entity in developing or providing a competing product.  Id.  Therefore, the jury's verdict did not require support from evidence showing the violation of the Non-Compete Provision caused Plaintiff to be benefitted, or Defendants to be harmed.  See id. at *4-5.  The

_____

[4] Plaintiff's claims were premised on the theory that, if 3D Systems had made substantial investments in the Primary Domains, future growth in the Primary Domains' sales and Plaintiff's royalty payments would have been more likely.  1/30/15 Order, 2015 WL 419687, at *1.  The parties disputed whether 3D Systems made such a promise.  Id. at *10.

[5] The 5/9/17 Order is available at 2017 WL 1900970.

Court also found the issues related to the Non-Compete Counterclaim were "complex enough to merit an equitable accounting," and an equitable accounting to determine recovery, rather than a jury finding to determine damages, was appropriate. Id. at *4-5.

The jury made no finding as to which particular conduct or incidents breached the Non-Compete Provision. At the November 20, 2017, non-jury trial, Defendants argued the jury's finding of liability on the Non-Compete Counterclaim was based on "the website that [Barranco] developed for [Christopher] Breault"; "the divulgement of the Quickparts technology"; and "the online quoting engine that Mr. Barranco developed." [Trans. of Non-Jury Trial ("11/20/17 Trans."), filed 12/5/17 (dkt. no. 386), at 131.] In closing arguments at the jury trial, Defendants identified the same three bases for finding liability on their Non-Compete Counterclaim. [Trial - Day 5 Trans. ("Day 5 Trans."), filed 10/13/17 (dkt. no. 340), at 77.]

Based on the jury's finding of a breach of the Non-Compete Provision and pursuant to the PSA, Defendants are entitled to "an equitable accounting of earnings, profits and other benefits arising from such violation." [PSA at § 6(f).] The sole issue remaining for adjudication is the recovery due Defendants because of Plaintiff's violation of the Non-Compete Provision.

For the non-jury trial, in lieu of direct testimony, Defendants presented the declarations of Michael White; Anand Parikh; Ronald Hollis, Ph.D.; and Andrew Johnson. [Dkt. nos. 373-76.] In lieu of direct testimony, Plaintiff presented his declaration and the declaration of James Ketner. [Dkt. nos. 369-70.] Plaintiff sought to present the declaration Tory Sirkin, but that declaration was stricken. [Minutes, filed 11/20/17 (dkt. no. 383).] The Court also heard live testimony from Plaintiff, Dr. Hollis, Mr. Johnson, and Mr. Ketner. Mr. White, Mr. Parikh, and Mr. Sirkin did not provide live testimony. [Id.] All exhibits indicated by stipulation, were admitted as evidence. [Dkt. no. 380.]

Plaintiff argued Defendants' recovery should be zero because some of the conduct at issue did not violate the Non-Compete Provision, and because none of the conduct caused him to receive any earnings, profits, or other benefits. Defendants sought to recover $5,000,000 as the inherent value of the technology Plaintiff accessed, as well as disgorgement of the entirety of Plaintiff's salary and all consideration paid to Plaintiff pursuant to the PSA.

## FINDINGS OF FACT

### I.  Testimony and Exhibits

1.  3D printing is a process whereby three-dimensional solid objects are created through a process called additive

manufacturing. Both stereolithography and laser sintering are additive manufacturing processes used in three-dimensional printing. [Direct Testimony of Ron Barranco ("Barranco Decl."), filed 11/17/17 (dkt. no. 369), at ¶ 7.] 3D printing contrasts with traditional "subtractive" manufacturing processes, in which a final part is formed by subtracting from a solid block of material, through cutting, grinding, or other subtractive processes. [Id.]

2. In 1998, Barranco launched the website domain name stereolithography.com ("SLAC"). [Id. at ¶ 3.] In 2009, Barranco launched the website domain name lasersintering.com ("LSCOM" or "LS.com"). [Id. at ¶ 4.] The purpose of SLAC and LSCOM (collectively "Primary Domains") was to allow consumers to have a 3D object created through additive manufacturing processes. Through the Primary Domains, a consumer with a design for an object can obtain a quote for the manufacturing of the item and have the object made using 3D printing techniques. [Id. at ¶¶ 3-4.]

**A.    The Evolution of 3D Systems' Parts Business**

3. In December 2007, 3D Systems hired Michael White to create a website that would allow for the instant online quotation ("IOQ") and ordering of 3D printed parts. [Decl. of Michael White ("White Decl."), filed 11/17/17 (dkt. no. 376), at

¶ 19.] At the time, less than five (5) sites in the world were able to accomplish that task. [Id.]

4. From December 2007 to mid-2008, Mr. White worked to build and improve the website. [Id. at ¶¶ 20-23.] 3D Systems launched the new internal quoting tool in June/July 2008. [Id. at ¶ 21.] In October 2009, 3D Systems' parts service was rebranded as 3dproparts.com. [Id. at ¶ 23.]

5. In April 2010, 3D Systems acquired a company called DPT-Fast, which was one of the first companies to quote, and take orders for, rapid prototyping parts online. [Id. at ¶ 24.]

B. **Quickparts Technology**

6. In 1999, Dr. Hollis founded Quickparts and served as its president and chief executive officer ("CEO"). Quickparts was the industry standard and market leader for the acquisition of custom manufactured parts in the 3D printing market. [Decl. of Ronald L. Hollis ("Hollis Decl."), filed 11/17/17 (dkt. no. 373), at ¶ 6.]

7. In 2008, Dr. Hollis was awarded a United States patent for the invention of Instantaneous Quotation System for Custom-Manufactured Parts, U.S. Patent No. 7,305,367, known as "QuickQuote." [Id. at ¶ 10.] With the QuickQuote technology, Quickparts was able to provide product designers with an instant online quote for the manufacturing of the designers' custom parts from prototype to production. By having an internet interface,

Quickparts expanded the market for 3D printer users by making it easy for everyone to experience the power of additive manufacturing. [Id. at ¶¶ 10-11.]

8. In February 2011, 3D Systems acquired Quickparts, purchasing all of Quickparts' outstanding shares in a cash transaction, paying $15.9 million, net of cash acquired, at closing, and a deferred payment of $7.2 million. [Id. at ¶ 1; Johnson Decl. at ¶ 16; Decl. of Anand Parikh ("Parikh Decl."), filed 11/17/17 (dkt. no. 375), at ¶ 20.] The annual revenue of Quickparts at the time of the acquisition was $24 million. [Johnson Decl. at ¶ 18.]

9. Quickparts is an additive manufacturing e-commerce system. The Quickparts website used patented technology to generate instant online price quotes for custom manufactured parts based on volume and geometry ("QP Technology"). 3D Systems acquired Quickparts to improve the instant online quoting process it had been developing since 2007. [White Decl. at ¶¶ 19-28.] The QP Technology was superior to the quoting technology 3D Systems had developed internally through 3dproparts.com and had acquired through the acquisition of DPT-Fast in 2010. [Johnson Decl. at ¶ 19; White Decl. at ¶ 28.]

10. At the time of acquisition, Quickparts was the most valuable intellectual capital 3D Systems had for its online parts

business, due to the QP Technology.  [White Decl. at ¶ 30; Parikh
Decl. at ¶ 24.]

**C.**    **The PSA and Non-Compete Provision**

11.  On April 18, 2011, Barranco and 3D Systems executed the
PSA, which was effective on April 19, 2011, for the purchase of
the Primary Domains by 3D Systems.  [PSA at § 1; Johnson Decl. at
¶ 28.]  In consideration for the PSA, Barranco granted 3D Systems
entitlement to:  title and possession of the Primary Domains; the
instant online quoting system used by the Primary Domains;
customers and customer lists; and existing license and royalty
agreements.  [PSA at § 1.]  3D Systems also received Barranco's
promises under the Non-Compete Provision.  [PSA at § 6.]

12.  In consideration for the PSA, 3D Systems promised
Barranco:  an immediate cash payment of $250,000.00 ("Up Front
Payment"); [PSA at § 1; Johnson Decl. at ¶ 30;] royalty payments
based on sales generated by the Primary Domains ("Royalty
Payments"); [PSA at § 3;] and a right to exercise a buyout, which
would terminate the right to Royalty Payments and grant
entitlement to a lump sum payment ("Buyout"), [id. at § 4].

13.  The Royalty Payments were calculated as fifty percent
of revenue not generated by 3D Systems and received through the
Primary Domains, and five percent of revenue generated by 3D
Systems and received through the Primary Domains.  [Id. at § 3.]

14.  Mr. Sirkin testified he leased LSCOM from Barranco in 2009.  [Trial - Day 2 Trans. ("Day 2 Trans."), filed 10/13/17 (dkt. no. 337), at 110.]  Because Barranco had generated the sales from LSCOM, 3D Systems paid him fifty percent of the LSCOM royalties.  3D Systems generated the sales from SLAC, and paid Barranco five percent of the gross SLAC sales.  [Stipulation Regarding Royalty Payments, filed 5/26/16 (dkt. no. 275).]

15.  The Royalty Payments totaled $210,996.02.  [Johnson Decl. at ¶ 44.]  Of this total, from April 2011 to February 2016, $177.799.29 were from LSCOM, and $28,893.21 were from SLAC.  An additional, combined total of $3,403.52 was paid for the period March 2016 to August 2016.  [Id. at ¶ 32.]

16.  The PSA provided the amount owed under the Buyout would be calculated as the net present value of the next five years of royalty payments, assuming the royalty payments remained at the average level of the previous two years.  [PSA at § 4.]

17.  On August 10, 2016, Barranco exercised the Buyout.  [Johnson Decl. at ¶ 34.]  3D Systems issued Barranco a check in the amount of $120,818.00 ("Buyout Payment").  [Id.]  The Buyout Payment was calculated based on royalty payments during the period from August 2014 to July 2016.  In that period, the average annual royalties were $4,666.00 from SLAC and $20,729.00 from LSCOM.  The total Buyout Payment consisted of $22,597.00 attributable to SLAC, and $98,221.00 attributable to LSCOM.

[Johnson Decl., Exh. 5 at 4 (spreadsheet calculating Buyout Payment).⁶]

18. Barranco did not cash the check tendering the Buyout Payment. However, the amount of the Buyout Payment is still owed pursuant to the PSA. [11/20/17 Trans. at 92-93.]

19. The PSA contains the Non-Compete Provision which prohibited Barranco from 1) engaging in any competition; or 2) becoming an employee, agent or consultant of, or acquiring or having any proprietary or other equity interest in, or otherwise participating or assisting in, the business of any person, firm or business that engaged in competition for five years from the effective date of the PSA. [PSA at § 6.]

20. Under the Non-Compete Provision, "'Competition' means the development, design, offering, marketing, sale or provision of services and products that have been developed, designed, offered, marketed, sold or otherwise provided by the [purchased web] Domains prior to the Effective Date." [Id.]

21. The Non-Compete Provision prohibited more than just monetization of a competing product; among other things, it prohibited the development and design of competing products and services. [Id.; 11/20/17 Trans. at 92.]

---

⁶ Exhibit 5 to the Johnson Declaration is a copy of Trial Exhibit 384, and consists of multiple documents that are not consecutively paginated. All citations to Exhibit 5 refer to the page numbers assigned by the district court's electronic filing system.

22.   The Non-Compete Provision specifically contemplated Barranco's employment and incorporated by reference his separate employment agreement: "provided that Mr. Barranco may provide services under his respective employment agreement with 3D Systems without violating this covenant."  [PSA at § 6(b).]

23.   The confidentiality portion of the Non-Compete Provision governed Barranco's disclosure of "any secret or confidential information . . . of or belonging to the Acquired Assets."  [Id. at § 6(e).]  The Acquired Assets were the LSCOM and SLAC web domains.  [Id., Exh. A (listing Acquired Assets).]

24.   Before agreeing to the Non-Compete Provision, the parties considered factors including the consideration exchanged for the Acquired Assets, Barranco's access to confidential information relating to the Acquired Assets, and 3D Systems' interest in protecting the value of the Acquired Assets.  [PSA at § 6(c).]

25.   In the Non-Compete Provision, Barranco promised 3D Systems he would not compete directly or indirectly, such as by participating or assisting in the business of any person or entity engaged in competition with 3D Systems.  [Id. at § 6(b).] Barranco was aware when he executed the PSA that he had an affirmative obligation not to compete with 3D Systems and could not develop products that could compete with 3D Systems for a

period of time. [Trial - Day 1 Trans. ("Day 1 Trans."), filed 10/13/17 (dkt. no. 336), at 162.]

26. Violation of the Non-Compete Provision entitles 3D Systems "to preliminary and injunctive relief as well as to an equitable accounting of earnings, profits and other benefits arising from such violation." [Id. at § 6(f).]

27. The equitable accounting remedy is "not exclusive," and is cumulative with 3D Systems' other rights and remedies "at law, in equity, by contract or otherwise." [Id. at § 6(g).]

28. The Non-Compete Provision expired on April 18, 2016. [Id. at § 6(b).]

**D.   Significance of the Non-Compete Provision to the PSA**

29. Mr. Johnson is the vice president and chief legal officer of 3D Systems. [Johnson Decl. at ¶ 2.] Johnson drafted the PSA on behalf of 3D Systems. [Trial - Day 3 Trans. ("Day 3 Trans."), filed 10/13/17 (dkt. no. 338), at 32.]

30. Johnson stated 3D Systems would not have entered into the PSA with Barranco, nor would it have paid him the consideration thereunder, without the Non-Compete Provision. [Johnson Decl. at ¶ 31.] Johnson testified the critical part of the Non-Compete Provision for 3D Systems was not "just sales," and explained:

> if you're working for us or if you sell us a
> business or assets, we are asking for a covenant
> that you're not developing, you're not designing
> things that are competitive with 3D Systems. To

> buy something and to have him competing by working
> against us on the side completely negates a huge
> part of the value that we've paid for.

[Day 3 Trans. at 70.]

31. Johnson testified that, in negotiating the PSA, Barranco never objected to or asked questions about the Non-Compete Provision. [<u>Id.</u>]

32. Damon Gregoire is the chief financial officer and senior vice president of 3D Systems. [Day 2 Trans. at 61.] Mr. Gregoire stated that, in negotiating the PSA, 3D Systems concluded the Primary Domains were not "worth nearly what [Barranco] thought." [<u>Id.</u> at 79.] Despite this, the deal went through because 3D Systems reduced its exposure to the risk that the Primary Domains would not generate sufficient earnings. Over the course of negotiations, the up front consideration was reduced, and most of 3D Systems' obligation consisted of royalties, contingent on future sales. [<u>Id.</u> at 76 ("ultimately the way the deal was done was based on a small upfront payment and royalties so there is not a lot of risk to it"); <u>id.</u> at 77 ("So we didn't have the information to evaluate [the Primary Domains] as a business . . . if you base it on a very small upfront royalty, again, that lowers your risk."); <u>id.</u> at 104-05 ("it's a small upfront payment . . . $250,000, and we were paying royalties going forward. So if they don't deliver, [we] are not paying.").]

**E.**   **Value of the QP Technology**

33.   Dr. Hollis, founder of Quickparts and inventor of Quickquote, opined that the value of the QP Technology was $5,000,000.  [Hollis Decl. at ¶ 20; 11/20/17 Trans. at 63-65.]

34.   In quantifying the value of the QP Technology, Dr. Hollis considered the following factors:  the total amount spent for research, development, and technology; and a premium of two to three times that amount, representing the brain power and innovation required to develop the code.  [Hollis Decl. at ¶ 17.]

35.   Because of its deal to acquire Quickparts, 3D Systems retained Houlihan Lokey Financial Advisors, Inc. ("Houlihan Lokey") to perform a confidential valuation of the assets of Quickparts as of February 22, 2011 ("Valuation Date").  [11/20/17 Trans. at 102-03.]

36.   Houlihan Lokey is an international investment bank that provides advisory services in the areas of mergers and acquisitions, capital markets, financial restructuring and valuation.  [Johnson Decl. at ¶ 20.]  In 2010, the firm was ranked the number one mergers and acquisitions ("M&A") advisor for United States transactions.  [Id.]

37.   Houlihan Lokey's report, entitled "Valuation Analysis of Certain Assets of Quickparts.com, Inc. as of February 22, 2011," was generated as a result of 3D Systems' retention and

assignment. [11/20/17 Trans. at 102-03; Johnson Decl., Exh. 3 ("Houlihan Lokey Report").]

38. The intangible assets included in the Houlihan Lokey analysis of Quickparts consisted of trade names, trademarks, customer relationships, non-compete agreements, backlog and developed technology ("Intangible Assets"). [Houlihan Lokey Report at 4.]

39. The technology Quickparts developed was one of the Intangible Assets Houlihan Lokey evaluated. [Id. at 27.] The Quickparts technology Houlihan Lokey valued was the QP Technology, namely the Quickquote technology used to generate instant quotes to customers and potential customers. [Id.; Johnson Decl. at ¶ 22.]

40. Houlihan Lokey opined that, as of February 22, 2011, the fair value of the QP Technology was $4.73 million. [Johnson Decl. at ¶¶ 24-26; Houlihan Lokey Report at 7, 53.] Houlihan Lokey valued the total of Quickparts' Intangible Assets, including the QP Technology, at $12.27 million. [Houlihan Lokey Report at 7.]

41. 3D Systems used Houlihan Lokey's conclusions for financial reporting purposes and to assist the management of 3D Systems in allocating the purchase price among the acquired assets of Quickparts. [Johnson Decl. at ¶ 21.]

42.  The QP Technoloy is a labor-saving technology.  3D Systems told Houlihan Lokey that the QP Technology would allow it to avoid the salary expense of sixteen 3D Systems employees who would otherwise "manage its quoting activities."  [Houlihan Lokey Report at 52.]  Houlihan Lokey derived its valuation of $4.37 million as the net present value of the expected salary savings, adjusted for taxes.  [Id. at 53.]

43.  Houlihan Lokey used a discount rate of 23%, meaning that the salary savings occurring in future years were calculated to have a present value worth 23% less for each year farther out in the future that the benefit occurs.  [Id.]  Houlihan Lokey stated the QP Technology, which it evaluated on February 22, 2011, "undergoes approximately 20% worth of updates annually.  As such, by 2018, the [value of the QP Technology] is estimate to be de minimis."  [Id. at 52.]

44.  At the time of the Quickparts acquisition, 3D Systems valued the QP Technology at $4.73 million.  [Johnson Decl. at ¶ 25.]

**F.   Violations of the Non-Compete Provision**

**Barranco's Use of Private Email**

45.  In an email to Sirkin sent August 3, 2011 ("8/3/11 Email"), Barranco discussed technical details of the LSCOM website.  [Trial Exh. 291 at 1.]

46.   Barranco added to the 8/3/11 Email:  "PS; do not send any email to Stereolithography.com any longer.  This can be monitored by 3D.  NO, they cannot monitor LSCOM."  [Id. (emphasis in original).]

### Breault's Pro SLA website

47.   Mr. Breault no longer managed the SLAC web domain after Barranco sold it to 3D Systems.  Barranco offered to help Mr. Breault get a new website so he could start making money again.  [Day 2 Trans. at 51.]  Thereafter, Barranco provided Mr. Breault $5,200.00 to build a website named Pro SLA so Mr. Breault could "get back involved in doing prototyping."  [Id. at 58.]

48.   Mr. Breault understood SLA to mean stereolithography. [Id. at 10.]  Barranco testified that SLAC is short for "SLA" dot com, which in turn is short for "stereolithography.com."  [Day 1 Trans. at 18.]  The Pro SLA website was competitive to 3D Systems with respect to stereolithography.

### The QP Emails

49.   Mr. Johnson testified that Barranco, as an employee of 3D Systems, had or was given access to the QP Technology, which was copyrighted, highly confidential and proprietary to 3D Systems.  [Johnson Decl. at ¶ 42.]  3D Systems would never have allowed Barranco access to the QP Technology if he had not agreed to the Non-Compete Provision of the PSA.  [Id.]

50.  Sometime prior to February 19, 2012, Barranco obtained and provided the QP Technology to David Pham.  [Trial Exh. 319 at 1-3.]  Barranco described Mr. Pham, who was not a 3D System employee, as his "personal programmer."  [Day 1 Trans. at 163.]

51.  In emails transmitting the QP Technology to Mr. Pham and to Barranco's son, R.J. Barranco ("QP Emails"), Barranco stated:  "using this in my system is a side project to me and not what I am being asked for with my 'job' . . .  I am trying ot [sic] get the QP formula into my system for a different reason than the task assigned to me."  [Hollis Decl., Exh. 1 (QP Emails) at 3;[7] Day 1 Trans. at 184-85.]

52.  The proprietary QP Technology that enabled the Quickquote patent was attached to the QP Emails.  [Parikh Decl. at ¶ 14; White Decl. at ¶ 33; Hollis Decl. at ¶ 16; 11/20/17 Trans. at 61-63 (Hollis).]  The QP Technology contained in the QP Emails is the most important part of the quoting/ordering process.  [Parikh Decl. at ¶ 15; Hollis Decl. at ¶ 16.]  The quoting/ordering process will not work without the software code contained in the QP Emails.  [Parikh Decl. at ¶¶ 15-17.]

---

[7] A copy of Trial Exhibit 319 is submitted as Exhibit 1 to the Hollis Declaration.  The QP Emails appear on this district court's electronic filing system as a single document that is not consecutively paginated.  All citations to the QP Emails refer to the page numbers assigned by the electronic filing system to Exhibit 1 of the Hollis Declaration.

53.  Mr. Johnson testified that Barranco neither had
authorization from 3D Systems to share the QP Technology with
anyone, including third party non-employees, nor permission to
use the QP Technology in a new, more powerful quoting system.
[Johnson Decl. at ¶¶ 25, 43.]

54.  As of February 19, 2012, at Barranco's direction,
Mr. Pham had done an extensive analysis and provided Barranco
with a breakdown of the QP Technology.  [QP Emails at 1-3; Trial
Exh. 318 at 1.]  On February 20, 2012, Mr. Pham explained to
Barranco that he could convert the QP Technology into his new
system by loading the xml data into a db form and getting prices
through the system.  [QP Emails at 2.]

55.  In an email on February 21, 2012 ("2/21/12 Email"),
Barranco stated:  "This is why I gave David [Pham] a second
project of slightly less importance which is the inserting the QP
formula or converting the QP formula to php so we can actuall
[sic] install the formula into our new 'pricing engine' which
David did a nice job of building."  [Trial Exh. 318 at 1.]
Barranco testified that Mr. Pham "tunneled" the QP Technology
into his server for him and was "instrumental in the transferring
of the code that was sent to me through our virtual private
network onto our server where I had control of it."  [11/20/17
Trans. at 21.]

56.  The QP Technology was not of or belonging to the
Acquired Assets under the PSA.  Dr. Hollis testified that 3D
Systems acquired the QP Technology from Quickparts in February
2011.  [Hollis Decl. at ¶¶ 10-13.]

## New Quoting Engine Development

57.  Mr. Sirkin testified that Barranco developed a new,
more powerful quoting engine.  [Day 2 Trans. at 144-45.]
Mr. Sirkin testified that Barranco intended him "to be able to
use his new and more powerful quoting engine" in the 3D printing
industry and on the web domains Mr. Sirkin owned.  [Day 2 Trans.
at 145-46.]  Mr. Sirkin testified that, in June and July of 2013,
Barranco asked him to test the new quoting engine.  [Id. at 146.]

58.  On March 19, 2013, in response to Mr. Sirkin's
criticisms that LSCOM's quoting engine, which was originally
created by Barranco, was "jacked up" and "buggy," Barranco
responded:  "FYI I haven't been wasting any time on the other one
I will show you something cool soon[.]"  [Trial Exh. 322 at 1.]

59.  In emails between Barranco and Mr. Sirkin on April 26,
2013 ("4/26/13 Emails"), Barranco agreed he would be able to put
IOQ technology into a web domain Mr. Sirkin owned after Barranco
filed suit against 3D Systems.  [Trial Exh. 324 at 2.]  Barranco
explained he had multiple sources for "IOQ for rtv molding," and
among them, **one i copied from QP** and Forecasts."  [Id. at 1
(emphasis added).]

60.  On April 27, 2013, Barranco emailed Mr. Sirkin:  "This weekend I am working specifically on a version of the new quote system that would eventually be for LSCOM . . . .  Do you have access to any [process formulas, such as] the spreadsheet type that sales may use[?]"  [Trial Exh. 323 at 1.]

61.  On June 27, 2013, Barranco emailed Mr. Sirkin and Mr. Pham with a subject line of "Test new system" and wrote:  "Please take some time and start looking at the new system. . . . I dont ythink u xan beak [sic] anything."  [Trial Exh. 325 at 1.]

62.  On July 9, 2013, Mr. Sirkin, Mr. Pham, and Barranco coordinated a run-through and demonstration of the new quoting system.  [Trial Exhs. 326, 327.]

63.  On September 19, 2013, upon receiving a marketing email entitled "Quickparts Now Accepts Common 3D CAD files for online quoting," Mr. Sirkin asked Barranco:  "Can your new quoting engine do this?"  [Trial Exh. 331 at 1.]  Barranco responded and provided a list of functions of his new quoting engine.  [Id.]

64.  In emails sent September 24 and 25, 2013, Barranco told Mr. Pham, "If ever you thought you could pull off a system . . . now is the time. . . .  This is either leased or shelved again, I will have to decide by this weekend."  Mr. Pham replied to Barranco:  "i work only on your [new quoting] system night and day man.. [sic]  i dont' [sic] even go out on weekends becaues [sic] of this damn thing."  [Trial Exh. 332 at 1.]

23

65.  In January 2014, discussing a trip to Hawai`i, Mr. Sirkin told Barranco that "[i]t would be awesome to have that trip also include a discussion of our bright future with 3D out of our lives."  [Trial Exh. 334.]

66.  In the 4/26/13 Emails, *supra* Finding of Fact ¶ 59, Mr. Sirkin asked Barranco:  "You think 3D will have an issue with a domain that you supplied IOQ to and that I run and potentially pay you commission on?"  [Trial Exh. 324 at 2.]  Barranco replied that the existing contract allows him "to lease quote engines to whomever I want., [sic] I just have to split the royalties." [<u>Id.</u> at 1.]

67.  At the jury trial, Mr. Gregoire, testified that Barranco "had plenty of other ideas and ways to monetize or he thought monetize other web properties, web development or to further things, and we said that would be great.  If we decide together to do these, we will split any royalty revenues that the company would get 50/50 with you."  [Day 2 Trans. at 84.]

**G.   Mr. Sirkin Cancels the LSCOM License**

68.  Because of the problems Mr. Sirkin had with the LSCOM quoting engine, he wanted to use the QP Technology.  [Johnson Decl. at ¶ 40.]  Mr. Sirkin believed that he was entitled to the QP Technology pursuant to the terms of his licensing agreement and asked 3D Systems to provide it to him.  [<u>Id.</u>]

69. Mr. Johnson, on behalf of 3D Systems, explained to Mr. Sirkin that he was not entitled to use the QP Technology. [Day 3 Trans. at 86–87.] 3D Systems was open to the concept of licensing the QP Technology to Mr. Sirkin for a fee, but Mr. Sirkin did not pursue it. [Id.] Instead, in September 2015, Mr. Sirkin terminated his agreement with 3D Systems to license LSCOM. At that time, he told Mr. Johnson: "The instant quoting on LS.com is so dated that it hardly ever worked anyhow, which is why we moved away from this agreement in the first place." [Trial Exh. 367.]

## H.   Barranco's Interaction with Galenfeha, Inc.

70. In late December 2016, eight months after the expiration of the Non-Compete Provision, Galenfeha, Inc. ("Galenfeha") CEO, James Ketner told Barranco he needed to find a profitable company to merge with Galenfeha to give value to its common stock. [Direct Testimony of James Ketner ("Ketner Decl."), filed 11/17/17 (dkt. no. 370), at ¶ 3.]

71. Galenfeha is headquartered in Fort Worth, Texas, and reportedly generates revenue by earning royalties from products it developed, providing consulting services, and directly investing in a diversified group of businesses. [Id. at ¶ 2.]

72. Barranco told Mr. Ketner he knew somebody in the additive manufacturing industry who might be willing to sell their company. [Id. at ¶ 3.] The potential acquisition that

Barranco identified was Additive Manufacturing, LLC ("Additive Manufacturing"), which is owned by Mr. Sirkin. [Id. at ¶ 4.]

73. Barranco testified that, in January 2017, a proposed transaction was announced between Mr. Sirkin's Additive Manufacturing and Galenfeha for $14 Million ("Galenfeha Transaction"). [11/20/17 Trans. at 30.]

74. For the acquisition, Mr. Sirkin represented to Mr. Ketner that he was bringing a fully operational online quoting engine to Galenfeha. [Id. at 116-117 ("We don't need any new quoting system. What we have is working just fine. Why do we want to pay for a new quoting system?"); Ketner Decl. at ¶ 7.]

75. At the time the Galenfeha Transaction was announced, Barranco was named the Chief Technology Officer ("CTO") of Galenfeha. [11/20/17 Trans. at 30.]

76. Barranco was named Galenfeha's CTO in order to assist with opportunities for fundraising. [Ketner Decl. at ¶ 5.] The press release announcing Barranco as CTO provided a quote from Barranco stating: "[T]he company is exactly what I was looking for in order to bring recently developed technology into the marketplace . . . . [T]he new technology I bring to Galenfeha will position us for significant growth in the near future." [11/20/17 Trans. at 30-31.]

77. Mr. Ketner testified that, ultimately, the Galenfeha Transaction fell through because the auditors could not confirm

the accuracy of the revenue numbers reported by Additive
Manufacturing.  [11/20/17 Trans. at 110.]

78.  Barranco testified that, as a result of introducing
Mr. Sirkin and Mr. Ketner and proposing the Galenfeha
Transaction, he purchased Galenfeha stock.  As of November 20,
2017, Barranco is down approximately $60,000 on his Galenfeha
stock.  [Id. at 43-44.]

79.  Barranco and Mr. Ketner testified that Barranco
received no earnings, profits, or other benefits from his
interactions with Galenfeha.  [Id. at 31 (Barranco), 117-118
(Ketner).]

**I.   Salary Paid to Barranco**

80.  3D Systems paid Barranco $280,033.00 in salary from
April 2011 to February 2013.  [Johnson Decl. at ¶ 38; 11/20/17
Trans. at 37.]

81.  Mr. Johnson testified that, after learning about the QP
Emails during discovery in this litigation, he concluded that
Barranco "had stolen" the QP Technology.  [Day 3 Trans. at 89.]
Mr. Johnson also testified that, if 3D Systems had known of the
QP Emails, "[Barranco] would have been fired for cause."
[11/20/17 Trans. at 84.]

82.  Mr. Johnson testified 3D Systems hired Barranco to
perform other tasks before the PSA was executed, but after the

PSA was executed, Barranco's responsibilities included working on the Primary Domains. [Id. at 74.]

83. Mr. Johnson testified that Barranco's title at 3D Systems was "Manager of Print3D." [Id. at 75.] The PSA does not offer Barranco employment because, before the PSA was executed, Barranco "was hired as manager for Print 3D as part of his responsibilities, but like any employee, he had multiple responsibilities, including working on the domains." [Id.]

J.    **Lack of Earnings, Profits, or Other Benefits**

84. Barranco testified that he has received no "earnings, profits, or other benefits from the development of, or participation in, any services and products that were developed, designed, offered, marketed, or sold provided by the Domains prior to the effective Date." [Barranco Decl. at ¶ 23.]

85. Barranco testified that, in the 2014, 2015, and 2016 tax years, his taxable income consisted only of the Royalty Payments and the Buyout Payment. [Id. at ¶¶ 24-27.] Barranco's tax returns were received in evidence, and corroborate that testimony. [Trial Exhs. 50-52; Minutes, filed 2/5/2018 (dkt. no. 389) (admitting certified tax returns into evidence).]

II.   **Findings**

Having considered the declarations, jury trial testimony, non-jury trial testimony, and exhibits submitted by the parties, the Court finds as follows:

## A.  Payments Beteween the Parties

86.  3D Systems paid Barranco $280,033.00 in salary for work from April 2011 to February 2013.

87.  Under the PSA, Barranco received:  an Up Front Payment of $250,000.00; total Royalty Payments of $210,996.02; and a Buyout Payment of $120,818.00.

## B.  Value of the QP Technology

88.  The Houlihan Lokey methodology credibly estimates the value of the QP Technology to 3D Systems at the time of the Valuation Date.  Specifically, the Court finds 3D Systems could expect a flow of future cost savings as a result of using the QP Technology, rather than sixteen salaried employees, to manage its quoting activities.  The Court therefore finds, as of February 22, 2011, the net present value of the future benefits 3D Systems expected from the QP Technology was $4.73 million.

89.  The Court makes no finding as to the value of the QP Technology today.  The February 2011 estimate of saving the salaries of sixteen employees is stale.  No evidence shows what benefits the QP Technology causes today, whether it is still in use, or whether similar or superior quoting engines are now available.  No evidence shows how the February 2011 or February 2012 version of the QP Technology compares to the current version.

90.  The Houlihan Lokey report shows users of the QP Technology experience benefits to the extent the QP Technology causes labor savings.

**C.   Violations of the Non-Compete Provision**

### Barranco's Use of Private Email

91.  The 8/3/11 E-Mail is part of conduct violating the Non-Compete Provision.

### Breault's Pro SLA website

92.  Barranco and Mr. Breault credibly testified that Barranco provided Mr. Breault $5,200.00 to help Mr. Breault obtain a new website.

93.  The record does not indicate precisely when Barranco helped Mr. Breault obtain a new website, but it is clear this occurred soon after the Effective Date of the PSA.

94.  Mr. Breault's website was named Pro SLA.  This name refers to stereolithography.  The SLAC web domain name, one of the Primary Domains, also refers to stereolithography.

95.  Barranco's involvement with the Pro SLA website assisted Mr. Breault with the development of a product or service competing with SLAC, and therefore violated the Non-Compete Provision ("Pro SLA Violation").

96.  There is no evidence Barranco received any earnings, profits, or other benefits arising from the Pro SLA Violation. No evidence shows Barranco's involvement with the Pro SLA website

caused him to receive:  salary or wages; royalties or sales commissions; any property interest in anything related to the Pro SLA website.

### The QP Emails

97.   The QP Emails show, at least from February 19 to 21, 2012, Barranco worked with Mr. Pham and R.J. Barranco to develop or design instant online quoting.

98.   The QP Emails show at least a portion of Barranco's development effort was undertaken independently, and not as part of his employment with 3D Systems.  Therefore, the development effort is not covered by the exception allowing Barranco to "provide services under his [] employment agreement with 3D Systems."  [PSA at § 6(f).]

99.   The parties intended the confidentiality portion of the PSA to govern only disclosures of confidential information that is of, or belonging to, the Primary Domains.  The QP Technology was not of, or belonging to, the Primary Domains.  The QP Emails therefore did not violate the confidentiality portion of the Non-Compete Provision.

100. The Primary Domains offered instant online quoting before Barranco conveyed them to 3D Systems under the PSA. Therefore, Barranco's development effort violated the Non-Compete Provision of the PSA ("QP Emails Violation").

101. No evidence shows Barranco received any earnings, profits, or benefits arising from the QP Emails Violation.

102. Mr. Johnson credibly testified that, after learning of the QP Emails, 3D Systems conducted an investigation because it was concerned that it had lost the ability to control the use and further dissemination of the QP Technology. Mr. Johnson also credibly testified that he was not aware of any evidence of use or further dissemination of the QP Technology because of Barranco. This testimony occurred five years and nine months after Barranco sent the QP Emails. No evidence shows any further use or dissemination of any portion of the QP Technology.

103. Barranco gained access to the QP Technology in his capacity as an employee of 3D Systems. Barranco's access to the source code attached to the QP Emails occurred prior to, and not because of, the QP Emails Violation.

104. Dr. Hollis credibly authenticated the source code attached to the QP Emails as being some portion of the QP Technology source code. However, on cross-examination, Dr. Hollis could not say what the function of that code was, or whether it was a significant part of the QP Technology. This Court therefore makes no findings as to the relationship between the source code attached to the QP Emails and the QP Technology. Specifically, this Court can make no inference, based on the QP Technology, as to: the inherent value of the source code

attached to the QP Emails; the benefits of possessing or using the attached source code; or the harm disclosing that source code might cause 3D Systems, either in February 2012 or now.

## New Quoting Engine Development

105. Barranco's efforts to develop a new quoting engine were efforts to develop or design a product or service that would compete with the quoting engine Barranco sold to 3D Systems under the PSA, and were therefore prohibited under the Non-Compete Provision ("Quoting Engine Development Violation").

106. The Quoting Engine Development Violation occurred at least beginning on March 19, 2013, and persisted at least until September 25, 2013.

107. No evidence shows the Quoting Engine Development Violation resulted in any product or service that was ever commercialized.

108. No evidence shows the Quoting Engine Development Violation caused Barranco to receive: salary or wages; royalties or sales commissions related to the use of a new quoting engine; any money from selling or licensing a new quoting engine; or ownership of any intellectual property rights.

**D.  The Galenfeha Transaction**

109. There is no evidence Barranco brought any technology to Galenfeha that he designed or developed in violation of the Non-Compete Provision.

110. Mr. Ketner and Barranco credibly testified that the Galenfeha Transaction fell through, and Barranco received no earnings, profits, or other benefits because of his involvement with Galenfeha.

111. Barranco credibly testified that he lost money on Galenfeha stock, is no longer Galenfeha's CTO, and was not paid during his tenure as CTO.

**E.** **Effects Caused by the Violations**

112. In light of evidence showing Barranco's income in 2014, 2015, and 2016 consisted only of payments made pursuant to the PSA, there is no evidence that Barranco obtained earnings, profits, or other benefits that could be attributed to any enhanced stature because of any of the 8/3/11 Email, Pro SLA Violation, QP Emails Violation, or Quoting Engine Development Violation (collectively, "Violations").

113. There is no evidence the Violations diminished the cost savings the QP Technology caused 3D Systems or otherwise harmed 3D Systems' use and enjoyment of the QP Technology.

114. No evidence shows Barranco caused 3D Systems to lose sales, to lower its prices, or to suffer reduced profit margins.

115. Mr. Johnson credibly testified 3D Systems would have fired Barranco for cause if it had learned of the QP Emails while Barranco was still an employee.  There is evidence that shows the QP Emails Violation would have caused Barranco not to receive

some of the payments he did receive from 3D Systems.
Specifically, if 3D Systems had discovered the QP Emails
Violation, Barranco would have been fired for cause and would not
have received his full salary.

**F.  <u>Barranco's Salary</u>**

116. Of the four Violations, the 8/3/11 Email, the Pro SLA
Violation, and the QP Emails Violation occurred while Barranco
was employed by 3D Systems, and the Quoting Engine Development
Violation occurred afterward.

117. Mr. Johnson credibly testified 3D Systems would have
fired Barranco for cause if it had learned of the QP Emails while
Barranco was still an employee.

118. The Non-Compete Provision specifically contemplated
Barranco's employment with 3D Systems and incorporated by
specific reference his employment agreement, and thus the PSA
incorporated Barranco's employment agreement.

119. Barranco's salary was consideration for his employment
agreement as well as the Non-Compete Provision.

120. Of the $280,033.00 in salary Barranco received for work
from April 2011 to February 2013, because the 8/3/11 Email was
the first violation of the Non-Compete Provision and the February
2012 QP Emails were grounds for termination with cause,

$229,117.91 represents the amount of Barranco's unjust enrichment.[8]

## G.   Consideration Attributable to the Non-Compete Provision

121. Barranco possessed confidential information about the Primary Domains sold under the PSA.

122. Mr. Johnson credibly testified that, if Barranco were to compete against the assets conveyed under the PSA, this would undermine the value of the assets 3D Systems had purchased.

123. Mr. Johnson credibly testified that, without the Non-Compete Provision, 3D Systems would not entered into the PSA to acquire the Primary Domains from Barranco or have offered him the consideration that it did.

124. Mr. Johnson credibly testified that, over the course of negotiating the PSA, Barranco could have objected to the Non-Compete Provision, but he did not.

125. 3D Systems valued both the covenant not to sell competing products or services for five years ("No-Sales Covenant") and the covenant not to develop or design competing products or services for five years ("No-Development Covenant") contained within the Non-Compete Provision.

126. The No-Sales Covenant primarily benefits 3D Systems during the first five years after the Effective date of the PSA,

---

[8] $229,117.91 is $12,728.77 per month for 18 months in which violations of the Non-Compete Provision occurred.

before the Non-Compete Provision has expired.  During that time, the No-Sales Covenant prohibits Barranco from selling in competition with the Acquired Assets.

127. The No-Development Covenant primarily benefits 3D Systems after the first five years, when the Non-Compete Provision is recently expired.  The No-Development Covenant prevents Barranco from immediately entering the market and selling in competition with 3D Systems by delaying Barranco's entry until he can first develop and design a competing product. It thereby further extends the period during which the Acquired Assets are protected from Barranco selling a competing product or service.  This extra benefit is of limited duration:  after Barranco takes the time necessary to develop or design a competing product, he can enter the market and sell in competition with the Primary Domains.

128. The No-Development Covenant also protects 3D Systems against risks that arise from the difficulty of detecting and proving violations and of detecting and proving the earnings that arise from such violations.  The No-Development Covenant deters the undertaking independent development efforts, which if successful, might cause temptation to disregard the Non-Compete Provision and to sell in competition.

129. The No-Development Covenant is a detrimental promise made by Barranco.  Some portion of the consideration Barranco

received under the PSA compensates Barranco for the No-Development Covenant. If the PSA had omitted the No-Development Covenant, Barranco would have received a lesser consideration in exchange from 3D Systems.

130. Because the Buyout right benefits Barranco in proportion to expected later-year sales, the Buyout Payment is the part of the consideration most related to the No-Development Covenant.

131. The Royalty Payments, which are proportional to actual sales in the inner years of the agreement, are the part of the consideration most related to the No-Sales Covenant, which only protects sales during the first five years.

132. At least some part of the consideration exchanged under the PSA supports Barranco's No-Development Covenant.

133. Not all of the consideration is for the breached No-Development Covenant. The consideration Barranco received also supports his conveyance of the Acquired Assets to 3D Systems and his agreement to split the revenues generated by the Acquired Assets. The August 10, 2016 Buyout Payment is also consideration for the termination of Barranco's right to receive any royalties based on the revenues from the Acquired Assets.

134. Of Barranco's $120,818.00 Buyout Payment, $22,597.00 is attributable to Barranco's right to a 5% royalty on the SLAC web domain, and $98,221.00 is attributable to Barranco's right to 50%

of royalties from the LSCOM web domain.  Because 3D Systems retains title and possession of the Primary Domains, it would effect an unfair penalty for Barranco to forfeit all of the consideration he received for conveying the Primary Domains to 3D Systems.  Further, 3D Systems received its 95% and 50% share of the revenues generated by the Primary Domains before Barranco exercised the Buyout on August 10, 2016, and 100% of the revenues generated after exercise of the Buyout.

135. The jury found 3D Systems did not promise to invest substantial resources into the Primary Domains.

136. Evidence of the Violations shows Barranco breached the No-Development Covenant starting from at least August 3, 2011, four months after the Non-Compete Provision was effective.

137. Barranco would be unjustly enriched if he retained the portion of the consideration attributable to the No-Development Covenant when he subsequently breached that promise.

138. Of the $120,818.00 Buyout Payment, some part is consideration for the expected earnings the Primary Domains will generate.  Some part is consideration for the protection of those earnings attributable to the No-Sales Covenant and the No-Development Covenant contained in the Non-Compete Provision.

139. Given that Barranco violated the No-Development starting from at least August 3, 2011, four months after the Non-Compete Provision was effective, it would be unjust for Barranco

to retain the entire $120,818.00 Buyout Payment.  The portion of the Buyout Payment representing Barranco's unjust enrichment is $60,409.00.

140. Of the $250,000.00 Up Front Payment, some part is consideration for:  1) the Primary Domains' expected earnings during the first five years after the Effective Date; 2) the protection of those earnings by the No-Sales Covenant; 3) the Primary Domains' expected earnings soon after the expiration of the Non-Compete Provision; 4) the protection of those earnings by the No-Development Covenant; and 5) the Primary Domains' expected earnings long after the expiration of the Non-Compete Provision, for which the No-Development Covenant affords no extra protection.

141. Because Barranco breached the No-Development Covenant starting from at least August 3, 2011, four months after the Non-Compete Provision was effective, it would be unjust for Barranco to retain the entire $250,000.00 Up Front Payment.  The portion of the Up Front Payment representing Barranco's unjust enrichment is $233,333.33, or $4,166.66 per month for each of the 56 months following the initial breach.

142. Barranco received Royalty Payments, based on the revenues generated by the Acquired Assets at rates set in the PSA.  Of the $210,996.02 in Royalty Payments, no part represents

the consideration for the No-Development Promise, and therefore Barranco is not unjustly enriched by its retention.2332233

143. The total amount of Barranco's unjust enrichment related to the Violations is $522,860.24. See *supra*, Findings of Fact ¶¶ 120, 138-41.

## CONCLUSIONS OF LAW

### A.  Jurisdiction and Venue

1.   This Court has jurisdiction pursuant to 28 U.S.C. § 1332 and venue pursuant to 28 U.S.C. § 1391(b).

### B.  Choice of Law

2.   The PSA is governed under Hawai`i law. See 1/30/15 Order, 2015 WL 419687 (analyzing PSA under Hawai`i contract law); see also Arrowood Surplus Lines Ins. Co. v. Paul Ryan Assocs., Inc., CIVIL 13-00505 LEK-KSC, 2014 WL 12597419, at *2 (D. Hawai`i Oct. 31, 2014) (discussing Hawai`i choice-of-law analysis) (citing Mikelson v. United Servs. Auto. Ass'n, 107 Hawai`i 192, 198, 111 P.3d 601, 607 (2005)).

3.   State law governs what equitable remedies are available for breach of contract. Compare Eckard Brandes, Inc. v. Riley, 338 F.3d 1082, 1088 (9th Cir. 2003) (disgorgement available for breach of contract under Hawai`i law), with Hoffman v. L & M Arts, 838 F.3d 568, 585 (5th Cir. 2016) (disgorgement not available, notwithstanding availability of disgorgement as remedy for certain causes of action arising under federal law, because

41

available remedies for breach of contract were controlled by
"Texas courts' singular focus on compensating a plaintiff for its
losses").

C.  **Law of the Case**

4.    The Non-Compete Provision of the PSA is reasonable and
enforceable.  See 5/9/17 Order, 2017 WL 1900970, at *5 (citing
UARCO Inc. v. Lam, 18 F. Supp. 2d 1116, 1121 (D. Hawai`i 1998));
see also 7's Enters., Inc. v. Del Rosario, 111 Hawai`i 484, 493 &
n.15, 143 P.3d 23, 32 & n.15 (2006) (employee's access to "trade
secrets, confidential information, or special customer
relationships" weighs in favor of reasonableness of non-compete
provision).

5.    3D Systems "drafted the PSA, and 'contracts are
construed against the drafter.'"  1/30/15 Order, 2015 WL 419687,
at *7 (quoting Kutkowski v. Princeville Prince Golf Course, LLC,
129 Hawai`i 350, 360 n.9, 300 P.3d 1009, 1019 n.9 (2013)).

6.    "[S]ince the PSA is not fully-integrated, the Court may
look to extrinsic evidence to determine [its] complete terms."
Id.  The parties executed the PSA three days after they executed
an employment agreement.  Id. at *5.  "[T]he sequencing of the
purported contract documents is [not] determinative" as to
whether "the parties intended [the PSA] to fully incorporate all
of the agreements that came before it."  Id. at *6.

D.    **Interpretation of Contracts**

7.    "Contract terms are interpreted according to their plain, ordinary, and accepted sense in common speech.  The court's objective is to ascertain and effectuate the intention of the parties as manifested by the contract in its entirety." Hawaiian Ass'n of Seventh-Day Adventists v. Wong, 130 Hawai`i 36, 45, 305 P.3d 452, 461 (2013) (internal citations and quotation marks omitted).

8.    The Hawai`i Supreme Court has stated:

> In general, parties may contract as they wish, and courts will enforce their agreements without passing on their substance. . . .  The principle of freedom of contract is itself rooted in the notion that it is in the public interest recognize that individuals have broad powers to order their own affairs by making legally enforceable promises.

City Express, Inc. v. Express Partners, 87 Hawai`i 466, 470 n.4, 959 P.2d 836, 840 n.4 (1998) (internal quotation marks omitted) (ellipse in original) (quoting Restatement of Contracts (Second) Introductory Note to Chapter 8 (1979)).  "Contracting parties are free to adjust their respective obligations to satisfy their mutual expectations." Id. at 470, 959 P.2d at 840.

9.    The supreme court has stated:

> Where the language of a contract is susceptible of two constructions, one of which makes it fair, customary and such as prudent men would naturally execute, while the other makes it inequitable, unusual, or such as reasonable men would not likely enter into, the interpretation which makes

43

a fair, rational and probable contract must be preferred.

Amfac, Inc. v. Waikiki Beachcomber Inv. Co., 74 Haw. 85, 110, 839

P.2d 10, 25 (1992) (citations and internal quotation marks

omitted).

    10.   The Ninth Circuit has stated:

> When interpreting state law, federal courts are
> bound by decisions of the state's highest court.
> In the absence of such a decision, a federal court
> must predict how the highest state court would
> decide the issue using intermediate appellate
> court decisions, decisions from other
> jurisdictions, statutes, treatises, and
> restatements as guidance.

PSM Holding Corp. v. Nat'l Farm Fin. Corp., — F.3d —,

No. 15-55026, 2018 WL 1178071, at *8 (9th Cir. Mar. 7, 2018).

**E.**    **Incorporation of Other Writings**

    11.   The Hawai`i Intermediate Court of Appeals ("ICA") has

stated:

> In order to effectively incorporate by reference a
> separate writing, or a portion thereof, into a
> contract, the language used . . . must explicitly,
> or at least precisely, identify the written
> material being incorporated and must clearly
> communicate that the purpose of the reference is
> to incorporate the referenced material into the
> contract (rather than merely to acknowledge that
> the referenced material is relevant to the
> contract, e.g., as background law or negotiating
> history).  At common law, in order to uphold the
> validity of terms incorporated by reference it
> must be clear that the parties to the agreement
> had knowledge of and assented to the incorporated
> terms.
>
>     Although it is clear that whether one
> agreement has incorporated another has factual

components, whether material has been incorporated presents a question of law.

Safeway, Inc. v. Nordic PCL Const., Inc., 130 Hawai`i 517, 527, 312 P.3d 1224, 1234 (Ct. App. 2013) (brackets, internal citations, and quotation marks omitted).

12. In light of this Court's factual finding, the Court concludes the PSA does incorporate the parties' employment agreement. *See* *supra* Findings of Fact ¶¶ 22, 118.

## F. **Equitable Accounting**

13. An accounting is ordinarily a two-step proceeding. The first step is to determine the right to an accounting, and the second being to determine the appropriate amount owed. 1A C.J.S. Accounting § 57. "An accounting does not yield a judgment for damages, but rather seeks to restore to the plaintiff what is rightfully his or hers." Id. at § 69.

14. The jury's verdict determined the right to an accounting. Pursuant to the PSA, 3D Systems is entitled to "an equitable accounting of earnings, profits and other benefits arising from such violation(s)." [PSA at § 6(f).]

15. In light of this Court's Findings of Fact, 3D Systems is entitled "to an equitable accounting of earnings, profits and other benefits arising from" the Violations. See id.

G.    **Forfeiture and Penalty Disfavored**

16.   The principle of avoiding forfeiture when possible is firmly established Hawai`i precedent.   See Santiago v. Tanaka, 137 Hawai`i 137, 157, 366 P.3d 612, 632, (2016) ("equity abhors forfeitures" (citing Jenkins v. Wise, 58 Haw. 592, 597, 574 P.2d 1337, 1341 (1978)); Hawaiian Ass'n of Seventh-Day Adventists, 130 Hawai`i at 49, 305 P.3d at 465 ("[e]quity does not favor forfeitures, and where no injustice would thereby be visited upon the injured party, equity will award him compensation rather than decree a forfeiture against the offending party." (brackets, internal citation, and quotation marks omitted)); Caldeira v. Sokei, 49 Haw. 317, 325, 417 P.2d 823, 828 (1966) ("Cases are legion holding that the courts abhor a forfeiture and they will construe a clause as a covenant rather than a condition if it is possible to do so." (citations and internal quotation marks omitted)); In re Miller's Tr., 48 Haw. 238, 245, 397 P.2d 443, 447 (1964) ("Equity will not imply a provision for penalty or forfeiture where none is expressed.").

17.   In light of the absence of any factual findings that Barranco's access to the QP Technology benefitted him, or harmed 3D Systems, and in the absence of any contractual provision specifying such harm or benefit, an award based on access to the QP Technology would amount to an improper penalty.

46

18.   In light of the absence of any factual findings regarding what benefit 3D Systems received from Barranco's employment, ordering disgorgement of the entirety of his salary earned over twenty-two months would amount to a penalty and forfeiture.

19.   Because 3D Systems received title to the Primary Domains and the flow of earnings they generated, disgorging the entirety of the consideration Barranco received for selling the Primary Domains would effect an improper forfeiture and penalty. 3D Systems' requested disgorgement order would leave Barranco without title to the Primary Domains and with nothing for having conveyed them to 3D Systems, and would leave 3D Systems to retain these assets with its costs fully refunded.

**H.    Earnings, Profits, and Benefits Arising from the Violations**

20.   "The phrase 'arising out of' is ordinarily understood to mean 'originating from,' 'having its origin in,' 'growing out of,' or 'flowing from.'  In the insurance context, this phrase is often interpreted to require a causal connection between the injuries alleged and the objects made subject to the phrase." C. Brewer & Co. v. Marine Indem. Ins. Co. of Am., 135 Hawai`i 190, 193, 347 P.3d 163, 166 (2015) (some internal quotation marks omitted) (quoting Am. Guar. & Liab. Ins. Co. v. 1906 Co., 129 F.3d 802, 807 (5th Cir. 1997)).  In the insurance context, the "causal requirement" that an injury "aris[e] out of" a particular

incident "has been held to be more than 'but-for' causation, but less than legal, proximate cause." Oahu Transit Servs., Inc. v. Northfield Ins. Co., 107 Hawai`i 231, 237 n.11, 112 P.3d 717, 723 n.11 (2005).

21.  For particular funds to be earnings, profits, or benefits "arising from" the Violations, their receipt must be caused by the Violations.  See id.  The causal requirement is "more than 'but-for' causation, but less than legal, proximate cause."  See id.

22.  A "but for" cause is "that without which the [thing] would not have occurred."  Knodle v. Waikiki Gateway Hotel, Inc., 69 Haw. 376, 392, 742 P.2d 377, 387 (1987) (internal citation and quotation marks omitted).

23.  The Violations are not a but for cause of Barranco's receipt of the payments from 3D Systems.  See id.

24.  In tort, a defendant's conduct is the legal cause, or proximate cause, of a plaintiff's injury if the "defendant's conduct was a substantial, as opposed to a negligible or trivial, factor in causing the harm.  In other words, a substantial factor is one that a reasonable person would consider to have contributed to the harm."  O'Grady v. State, 140 Hawai`i 36, 47, 398 P.3d 625, 636 (2017).

25.  The Violations were not a proximate cause of Barranco's receipt of the payments from 3D Systems.  See id.

26.  Because the Violations were neither the but for cause nor a proximate cause of Barranco's receipt of his salary payments, Up Front Payment, Royalty Payments, and Buyout Payment, these payments did not "aris[e] from" the Violations.  See Oahu Transit, 107 Hawai`i at 237 n.11, 112 P.3d at 723 n.11.

27.  "It is clear under Hawaii law that employees owe their employer a duty of loyalty."  Eckard Brandes, 338 F.3d at 1085 (citing Stout v. Laws, 37 Haw. 382, 392 (1946)).  While 3D Systems' Non-Compete Counterclaim did not specifically assert a claim for breach of the duty of loyalty, the Non-Compete Provision implies this duty.  The PSA is an asset purchase agreement which was contingent upon Barranco's employment with 3D Systems and specifically made reference to his employment agreement.  A duty of loyalty may be implied into an employment agreement, especially when read in conjunction with the specific language of the Non-Compete Provision.  This Court concludes that any violation of duties Barranco owed to 3D Systems under the employment agreement, but not under the PSA, are pertinent to determining what earnings, profits, and other benefits Barranco received arising from the Violations.  See 7's Enters., 111 Hawai`i at 489, 143 P.3d at 28 ("A court's decision to invoke equitable relief, such as the 'unclean hands' doctrine, is a matter within its discretion." (citing Ueoka v. Szymanski, 107 Hawai`i 386, 393, 114 P.3d 892, 899 (2005) (stating that "[t]he

relief granted by a court [in] equity is discretionary and will not be overturned on review unless the [trial] court abused its discretion"))); Schmidt v. Fid. Nat'l Title Ins. Co., Civil No. 07-00356 HG-LEK, 2009 WL 10676787, at *20 (D. Hawai`i Sept. 30, 2009) (equitable lien against defendants' property appropriate where "it is clear that [plaintiff] would not have made the loan if the [defendants] had disclosed the foreclosure judgments"); see also Keystone Fruit Mktg., Inc. v. Brownfield, 352 F. App'x 169, 172 (9th Cir. 2009) (citing Restatement (Second) of Agency § 393, cmt. e. (1958) (an employee is "not . . . entitled to solicit customers for [a] rival business before the end of his employment[,] nor can he properly do other similar acts in direct competition with the employer's business") (alteration in Keystone)). Any breach of the duty of loyalty does not, by itself, give rise to a remedy in restitution, but is highly relevant background information when fashioning an equitable remedy appropriate to the facts of this case. See Sato v. Wahiawa-Cent. Oahu Health Ctr., Inc., No. CAAP-13-0000042, 2015 WL 1231272, at *23 (Haw. Ct. App. Mar. 17, 2015).

I.  **Scope of Equitable Jurisdiction**

28. The supreme court has stated:

> A complaint in equity is an appeal to the exercise of the equity court's sound discretion.  Equity jurisprudence is not bound by strict rules of law, but can mold its decree to do justice, and a court of equity, once having assumed jurisdiction, may retain the case to afford complete relief.

<u>Beneficial Haw., Inc. v. Kida</u>, 96 Hawai`i 289, 312, 30 P.3d 895, 918 (2001) (internal citations and quotation marks omitted); <u>see also</u> <u>Jenkins</u>, 58 Haw. at 598, 574 P.2d at 1342 (court sitting in equity "has the plenary power to fashion a decree to conform to the equitable requirements of the situation"); 1A C.J.S. Accounting §69 ("A court of equity, having obtained jurisdiction for the purpose of an accounting, will settle the whole matter, and grant such incidental relief as may be necessary.").

29. The supreme court has stated:

> "[W]herever justice requires compensation to be given for property or services rendered under a contract, and no remedy is available by an action on the [] contract, restitution of the value of what has been given must be allowed."
> [12 Williston, Contracts §] 1479 [(3d ed. 1970)].
> Where performance of a contract by one party becomes excusably impossible and "the other party has partly or wholly performed without receiving compensation, justice requires the imposition of a quasi contractual obligation on the party receiving such performance to pay its fair value."
> 6 Williston, Contracts [§] 1972 (rev. ed. 1938).
> To the same effect are 5 Corbin, Contracts s 1102 (1964) and Restatement of Contracts s 468 (1932).

<u>Bishop Tr. Co. v. Kamokila Dev. Corp.</u>, 57 Haw. 330, 334, 555 P.2d 1193, 1196 (1976).

30. "[R]estitution is appropriate in situations . . . where an express contract does not fully address an injustice." <u>Porter v. Hu</u>, 116 Hawai`i 42, 55, 169 P.3d 994, 1007 (Ct. App. 2007).

31. This Court concludes that, "having assumed jurisdiction" to conduct an equitable accounting of the earnings,

profits, and other benefits arising from Barranco's violation of the Non-Compete Provision, it "may retain the case to afford complete relief." See Beneficial Haw., 96 Hawai`i at 312, 30 P.3d at 918. Because the fact-finder has already found a breach of contract, this Court has discretion to award contract remedies "and/or equitable relief in the form of disgorgement." See Hawaiian Ass'n of Seventh-Day Adventists, 130 Hawai`i at 49, 305 P.3d at 465.

32. This Court may appropriately consider awarding equitable remedies, in addition to an equitable accounting, where it concludes "[the PSA] does not fully address an injustice." See Porter, 116 Hawai`i at 55, 169 P.3d at 1007.

33. "[E]quity regards the substance rather than the form. . . . Equity goes behind the form of the transaction in order to give effect to the intention of the parties . . . ." Rand v. Rand, No. CAAP-12-0000555, 2016 WL 383158, at *8 (Hawai`i Ct. App. Jan. 29, 2016) (alteration and ellipses in Rand) (citation and quotation marks omitted). This Court, therefore, may disregard the "form" of the PSA, insofar as it does not identify separate consideration for the conveyance of assets and the Non-Compete Provision, in order to "regard[] the substance" of the transaction and "give effect to the intention of the parties," insofar as a promise to convey assets and a promise not

to compete are both detrimental promises, each requiring support by valuable consideration.  See id.

## J.    Effect of Jury Verdict

34.  "'When a jury is called upon to make findings in connection with both legal and equitable matters resting upon the same set of facts, the trial court is bound by the jury's findings of fact when making its equitable determinations.'" Porter, 116 Hawai`i at 58, 169 P.3d at 1010 (quoting SCI Management Corp. v. Sims, 101 Hawai`i 438, 452 n.12, 71 P.3d 389, 403 n.12 (2003)).

## K.    Equitable Versus Legal Restitution

35.  "[A]n equitable remedy may be invoked, . . . [like] in the federal courts, . . . 'only when legal remedies [are] inadequate.'"  Id. (quoting Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 509, 79 S. Ct. 948, 956, 3 L. Ed. 2d 988 (1959) (footnote omitted)).

36.  The Ninth Circuit has stated:

> Monetary restitution is appropriately
> characterized as equitable when it is intended "to
> restore to the plaintiff particular funds . . . in
> the defendant's possession."  [Honolulu Joint
> Apprenticeship & Training Comm. of United Ass'n
> Local Union No. 675 v.] Foster, 332 F.3d [1234,]
> 1237 [(9th Cir. 2003)] (quoting Great-West Life &
> Annuity Ins. Co. v. Knudson, 534 U.S. 204, 214,
> 122 S. Ct. 708, 151 L. Ed. 2d 635 (2002)).  But
> monetary restitution is appropriately
> characterized as legal in actions that simply seek
> to impose general personal liability on a
> defendant for money allegedly owed to the
> plaintiff.  Id. at 1238.

<u>Bayer v. Neiman Marcus Grp., Inc.</u>, 861 F.3d 853, 866 (9th Cir. 2017).

37. Where the particular funds have not been spent, but have been mingled with other funds, an equitable lien can be enforced against the mingled mass. <u>Bilyeu v. Morgan Stanley Long Term Disability Plan</u>, 683 F.3d 1083, 1095-96 (9th Cir. 2012).

38. The Plaintiff or Counterclaimant has "[t]he burden to show the [particular funds subject to restitution] remain in [the defendant's] possession." <u>See</u> <u>id.</u> at 1094 n.5 (citing Restatement (First) of Restitution § 215 cmt. b (1937) ("A person whose property is wrongfully taken by another is not entitled to priority over other creditors unless he proves that the wrongdoer not only once had the property or its proceeds, but still has the property or its proceeds or property in which the claimant's property or its proceeds have been mingled indistinguishably.")).

39. An order disgorging funds related to Barranco's Salary, Up Front Payment, Buyout Payment, and Royalty Payments is appropriately equitable and not legal because it would "restore . . . particular funds" and would not "impose general personal liability." <u>See</u> <u>Bayer</u>, 861 F.3d at 866 (citation and internal quotation marks omitted).

40. Under Hawai`i law, the trial court may properly "conduct[] a jury trial on the matters triable to a jury and also impose[] an equitable remedy upon determining that the contract

remedies available did not adequately address Defendants' unjust enrichment (a matter within the [trial] court's discretion)." <u>Porter</u>, 116 Hawai`i at 56, 169 P.3d at 1008.

41.  Because 3D Systems' damages at law for breach of the Non-Compete Provision would not be "ascertainable or remediable by reference to the contractual remedies provided for, equitable remedies [are] appropriate." <u>See</u> <u>id.</u> at 57, 169 P.3d at 1009.

42.  Where an unjust enrichment claim is tried to the court, it is "an equity action within the realm of assumpsit." <u>Id.</u> at 66, 169 P.3d at 1018.

**L.   Unjust Enrichment**

43.  "Hawaii's appellate case law explains the policy behind and purpose of restitution under Hawaii law.  That purpose is to deter wrongdoers from benefitting or profiting from their illegal conduct." <u>Exec. Risk Indem., Inc. v. Pac. Educ. Servs., Inc.</u>, 451 F. Supp. 2d 1147, 1156 (D. Hawai`i 2006) (citing <u>Peine v. Murphy</u>, 46 Haw. 233, 242–43, 377 P.2d 708, 714 (Haw. 1962); <u>Hong v. Kong</u>, 5 Haw. App. 174, 181, 683 P.2d 833, 840 (1984) (noting that "restitution is aimed at depriving the fraudulent party of benefits obtained by the tort")).

44.  The ICA has stated:

> [The] best explanation of unjust enrichment has been as follows:
>
> > It is a truism that "[a] person confers a benefit upon another if he gives to the other possession of or some other interest in

> money, land, chattels, or cho[]ses in action,
> . . . or in any way adds to the other's
> security or advantage."  Restatement of
> Restitution § 1 comment b (1937).  One who
> receives a benefit is of course enriched, and
> he would be unjustly enriched if its
> retention would be unjust.  <u>Id.</u> § 1
> comment a.  And it is axiomatic that "[a]
> person who has been unjustly enriched at the
> expense of another is required to make
> restitution to the other."  <u>Id.</u> § 1.  We
> realize unjust enrichment is a broad and
> imprecise term defying definition.  But in
> deciding whether there should be restitution
> here, we are guided by the underlying
> conception of restitution, the prevention of
> injustice.  <u>See</u> A. Denning, The Changing Law
> 65 (1953).

<u>Porter</u>, 116 Hawai`i at 55, 169 P.3d at 1007 (quoting <u>Durette v.
Aloha Plastic Recycling, Inc.</u>, 105 Hawai`i 490, 502, 100 P.3d 60,
72 (2004)).

45.  "'[I]n the damage action the [objective is] to recover
for the harm done to him, whereas in the restitution action [it
is] to recover the gain acquired by the defendant through the
wrongful act.'"  <u>Id.</u> at 56, 169 P.3d at 1008 (quoting 1 George E.
Palmer, The Law of Restitution § 2.1, at 51 (1978)).

46.  "A valid 'claim for unjust enrichment requires only
that a plaintiff prove that he or she conferred a benefit upon
the opposing party and that the retention of that benefit would
be unjust.'"  <u>Id.</u> at 55, 169 P.3d at 1007 (quoting <u>Durette</u>, 105
Hawai`i at 504, 100 P.3d at 74 (internal quotation marks,
citation, and brackets omitted)).

47. This Court has stated:

> Generally, "[a]n action for unjust enrichment cannot lie in the face of an express contract." Porter v. Hu, 116 Hawai`i 42, 169 P.3d 994, 1006 (Haw. App. 2007); State Farm Fire & Cas. Co. v. Chung, 882 F. Supp. 2d 1180, 1192 (D. Haw. 2012). Thus, "[w]here the parties to a contract have bargained for a particular set of rights and obligations, all claims involving those express rights and obligations properly lie in contract law and not in equity." Keahole Point Fish LLC v. Skretting Canada, Inc., 971 F. Supp. 2d 1017, 1040 (D. Haw. 2013).
>
> Balboa v. Hawaii Care & Cleaning, Inc., 105 F. Supp. 3d 1165, 1174 (D. Hawai`i 2015) (alterations in Balboa). Here, the parties do not dispute that a purchase and sale agreement was executed, and that each is alleging breach of that contract.

[Minutes, filed 5/23/16 (dkt. no. 262), at 1-2 (granting judgment as a matter of law to 3D Systems on Barranco's claim for unjust enrichment claim.]

48. An exception to the general rule exists so "that restitution is appropriate . . . where an express contract does not fully address an injustice." Porter, 116 Hawai`i at 55, 160 P.3d at 1007. The ICA has explicitly rejected the proposition that "unjust enrichment can **never** exist where the adverse parties have some type of express contract." Id. at 55 n.7, 160 P.3d at 1007 n.7 (emphasis added).

49. In jurisdictions with a contrary rule, that "tools of equity . . . are used only when no express contract is present," courts "hold[] that lost profits is the appropriate measure of

damages in suits concerning breaches of covenants not to compete . . . [and] unjust enrichment is not an appropriate measurement in these actions." TruGreen Cos. v. Mower Bros., Inc., 199 P.3d 929, 933 (Utah 2008) (citations omitted). Other courts have concluded that, for breach of a non-compete agreement, "[r]estitution, or a refund of the consideration paid," is an appropriate remedy, and is available as an alternative damages measured as the lost profits of the non-breaching party. Foti Fuels, Inc. v. Kurrle Corp., 90 A.3d 885, 897 (Vt. 2013) (citing Morris v. Homco Int'l, Inc., 853 F.2d 337, 346 (5th Cir. 1988)). This Court predicts the Hawai`i Supreme Court would also conclude that a "defendant is entitled to claim the return of the consideration as an alternative form of contractual relief if the jury concludes that plaintiff breached the terms of the noncompetition agreement." See id.

50. This case falls within the exception recognized in Porter so that unjust enrichment applies in the face of an express contract.

51. In Porter, the trial court "recognized that the contract did not expressly address the compensation of an agent who wrongfully lost his book of business as a result of the parent insurer's misconduct." 116 Hawai`i at 55, 169 P.3d at 1007. The ICA rejected the defendant's claim "that the contract between the parties provided . . . adequate redress" because "the

contract [did not] actually address[] a situation like this —
where Defendants are alleged to have wrongfully subverted the
contractual relationship to deprive Plaintiffs of their book of
business." Id. at 55-56, 169 P.3d at 1007-08.

52. This Court concludes the PSA does not address the issue
here, where violations of the Non-Compete Provision stopped short
of commercial exploitation and no earnings, profits, or other
benefits have yet arisen from the violation. See id. at 55 &
n.7, 169 P.3d at 1007 & n.7.

53. "Under Hawai`i law, attorney's fees are available in
'all actions in the nature of assumpsit.'" Eckard Brandes, 338
F.3d at 1087 (quoting Haw. Rev. Stat. § 607-14). To the extent
the entirety of 3D Systems' attorneys' fees cannot be fully
recovered under the assumpsit statute, Haw. Rev. Stat. § 607-14,
no injustice occurs. See Piedvache v. Knabusch, 88 Hawai`i 115,
119, 962 P.2d 374, 378 (1998) ("[I]t is . . . clear that [the
assumpsit statute] was not intended to render inoperative a
contract governing the allocation of expenses and attorney's fees
in litigation which involves only an adjudication of rights and
in which no monetary liability is in issue." (emphasis omitted)
(quoting Food Pantry, Ltd. v. Waikiki Business Plaza, Inc., 58
Haw. 606, 621, 575 P.2d 869, 879-80 (1978) (construing
predecessor statute, § 607-17))); Fought & Co. v. Steel Eng'g &
Erection, Inc., 87 Hawai`i 37, 50-51, 951 P.2d 487, 500-01 (1998)

("Normally, pursuant to the 'American Rule,' each party is responsible for paying his or her own litigation expenses.  This general rule, however, is subject to a number of exceptions: attorney's fees are chargeable against the opposing party when so authorized by statute, rule of court, agreement, stipulation, or precedent.").  3D Systems could have negotiated, but did not negotiate, a contractual provision to allocate expenses when litigation was required to enforce the Non-Compete Provision before any recoverable earnings, profits, or other benefits had arisen.

54.  Hawai`i "contract law allows — and at times even encourages — intentional breaches of contract."  <u>Francis v. Lee Enters., Inc.</u>, 89 Hawai`i 234, 243, 971 P.2d 707, 716 (1999) (citing R. Posner, Economic Analysis of Law § 3.8 (1972)).  This "amoral view" favors "'efficient' breaches of contract, *i.e.*, breaches where the gain to the breaching party exceeds the loss to the party suffering the breach."  <u>Id.</u>  "[B]reaching a contract constitutes a morally neutral act. . . .  [T]he duty to keep a contract at common law means a prediction that you must pay damages if you do not keep it—and nothing else."  <u>Id.</u> (internal citation and quotation marks omitted).

55.  No part of this Court's restitutionary award may aim to punish Barranco based on a moral view of the value of keeping contract promises.  <u>See</u> <u>id.</u>  Consistent with the "policy

considerations . . . of contract law," see id., equity also abhors the forfeiture of any part of the consideration Barranco justly received for the assets he conveyed and the promises he did keep.  Equity does not allow this Court's disgorgement order to exceed the portion of the consideration received attributable to the promises Barranco breached.

56.  To support an equitable award, 3D Systems must have adduced the evidence at trial showing the consideration paid which supports the equitable award.  Any excess recovery "would provide [3D Systems] a remedy inconsistent with the fundamental precepts of restitution, for it would give [3D Systems] more than they had."  See Beneficial Haw., 96 Hawai`i at 316, 30 P.3d at 922 (internal citation and quotation marks omitted).

57.  3D Systems has meet its evidentiary burden.  See id. The record shows the amount of consideration paid under the PSA and how each component of the consideration was calculated.  The record also shows the parties actively considered discounting uncertain future benefits under the PSA by making net present value calculations.

58.  The twenty three percent discount rate used in the Houlihan Lokey Report, and relied on by 3D Systems, provides an appropriate guidepost for the Court to compare payments occurring in different time periods.

59.   3D Systems is entitled to total disgorgement of $483,758.83, representing the portion of the payments for which it would be unjust for Barranco to retain because it is attributable to the promises he breached.

## M.   **Punitive Damages**

60.   Hawai`i courts refuse to allow punitive "damages in contract actions unless the conduct constituting the breach is also a tort for which punitive damages are recoverable. Traditionally, damages for breach of contract have been awarded to compensate the aggrieved party rather than to punish the breaching party." Id. at 241, 971 P.2d at 714 (internal citations and quotation marks omitted).

61.   Punitive damages are not appropriate in this case.

## N.   **Pre- and Post-Judgment Interest**

62.   "In diversity actions, state law determines the rate of prejudgment interest, and postjudgment interest is governed by federal law." Am. Tel. & Tel. Co. v. United Computer Sys., Inc., 98 F.3d 1206, 1209 (9th Cir. 1996) (citation omitted); see also In re Cardelucci, 285 F.3d 1231, 1235 (9th Cir. 2002) ("It has long been the rule that an award of post-judgment interest is procedural in nature and thereby dictated by federal law.").

63.   This Court has discretion to award prejudgment interest in equity when a judgment is delayed. See Eckard Brandes, 338 F.3d at 1088 (citing Kalawaia v. AIG Haw. Ins. Co., 90 Hawai`i

167, 977 P.2d 175, 180 (1999)).  Pre-judgment interest is awarded

"to correct injustice when a judgment is delayed for a long

period of time for any reason."  <u>Schmidt v. Bd. of Dirs. of Ass'n</u>

<u>of Apartment Owners of Marco Polo Apartments</u>, 73 Haw. 526, 534,

836 P.2d 479, 484 (1992).

        64.  In contract cases, Hawai`i law provides the court

discretion to award prejudgment interest and "to designate the

commencement date to conform with the circumstances of each case

. . . [as early as] the date when the breach first occurred."

Haw. Rev. Stat. § 636-16.  "Interest at the rate of ten per cent

a year, and no more, shall be allowed on any judgment recovered

before any court in the State, in any civil suit."  Haw. Rev.

Stat. § 478-3.

        65.  Prejudgment interest is awarded from August 3, 2011,

the date of the first breach of the Non-Compete Provision.

        66.  The rate of post-judgment interest is governed by 28

U.S.C. § 1961, which provides:  "[s]uch interest shall be

calculated from the date of the entry of the judgment, at a rate

equal to the weekly average 1-year constant maturity Treasury

yield, as published by the Board of Governors of the Federal

Reserve System, for the calendar week preceding the date of the

judgment."

## <u>ORDER REGARDING FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

AND NOW, following the conclusion of a bench trial in this matter, and in accordance with the foregoing Findings of Fact and Conclusions of Law, it is HEREBY ORDERED that:

1.    Barranco breached the Non-Compete Provision of the PSA.

2.    As a result of Barranco's breach, 3D Systems is entitled to invoke the equity jurisdiction of this Court and to demand an equitable accounting.

3.    Having performed an equitable accounting, this Court finds Barranco received no earnings, profits, or other benefits arising from his breach of the Non-Compete Provision.

4.    Fashioning complete relief in this case requires that Barranco disgorge, and 3D Systems recover:

```
$229,117.94 - Salary
$233,333.33 - Up Front Payment
$     0.00 - Royalty Payments
$ 60,409.00 - Buyout Payment
$522,860.24 - Total
```

5.    3D Systems is entitled to recover prejudgment interest beginning on August 3, 2011.

6.    3D Systems is entitled to recover post-judgment interest as permitted by statute.

Pursuant to Federal Rule of Civil Procedure 54, judgment shall enter in favor of 3D Systems on its breach of contract counterclaim in the amount of $522,860.24.

IT IS SO ORDERED.

DATED AT HONOLULU, HAWAII, March 30, 2018.



    /s/ Leslie E. Kobayashi
Leslie E. Kobayashi
United States District Judge

**RONALD BARRANCO VS. 3D SYSTEMS CORP., ET AL.; CIVIL 13-00412 LEK-RLP; FINDINGS OF FACT AND CONCLUSIONS OF LAW AND ORDER**